HYMAN MARGULIS v. NATIONAL ENAMELING AND STAMPING COMPANY, Appellant.—23 S. W. (2d) 1049.

Division One, February 3, 1930.

*Jones, Hocker, Sullivan & Angert* and *W. A. McCaleb* for appellant.

*Jesse T. Friday* and *Harry Baer* for respondent.

422

FRANK, J.—Action by plaintiff, respondent here, against defendants, National Enameling & Stamping Company and Justus W. Pfaff, to recover for personal injuries sustained by plaintiff on May 9, 1925, as a result of being struck by an automobile driven by defendant Pfaff. Verdict and judgment in favor of plaintiff in the sum of $27,500. Defendant, National Enameling & Stamping Company appealed.

The case was submitted to the jury under the humanitarian rule.

No question is raised as to the sufficiency of the evidence to establish prima-facie that plaintiff's injuries were caused by the negligence of the driver of the automobile. The claim is that appellant's demurrer to the evidence should have been given for the reason that the evidence did not tend to show that defendant Pfaff, the driver of the car, was a servant of appellant, and was at the time in question operating the car as the agent and servant of appellant.

Pfaff, the driver, testified that on May 9, 1925, he was sales manager and city salesman for appellant and had been such for about two and one-half years; that he owned the car, but appellant paid the cost of its upkeep, which included gasoline, oil, tires and general wear and tear on the car; that at the time the car struck plaintiff, he (Pfaff) was driving the car and was on his way from his office at the plant to call on Kinberg Brothers, in St. Louis, Missouri, regular customers of appellant, for the purpose of selling them a bill of goods for appellant. The foregoing is all the evidence touching the relation existing between appellant and Pfaff, the driver of the car,

Appellant's contentions are (1) that the burden was on plaintiff to prove the relationship of master and servant between appellant and Pfaff, and (2) that the right of the master to control the method and detail of the work as to time, place and manner is essential to the relation of master and servant.

The disposition of these contentions involve (1) the determination of the character and quantum of evidence necessary to show prima-facie the relation of master and servant, and (2) whether or not the record contains such evidence.

The demurrer to the evidence challenges the sufficiency of the evidence to show, prima-facie, that Pfaff was appellant's servant, and in furtherance of appellant's business at the time it struck and injured plaintiff.

In 39 Corpus Juris, section 1590, page 1361, it is said: "The relation of master and servant is prima-facie established where it is shown that the alleged servant was performing labor for defendant at the time of the injury."

In Perry v. Ford, 17 Mo. App. 212, the defendant Brown, owner of a certain building and premises adjacent thereto, employed one Cotter to reconstruct and remodel a certain water closet and privy vault located on said premises. In doing said work the vault was left open and unguarded without any light or signal to warn those who would have occasion to pass that way. The plaintiff fell into said vault and was injured. The suit was against the owner of the building to recover damages for such injuries. The employees of Cotter did the actual work of repairing the water closet. The only evidence as to the contract made by defendant for the repair of the water closet, was the testimony of defendant himself, who said: "I gave the contract to repair this closet to Mr. Cotter, and when he got ready to repair it, I went with him into the saloon and told Mr. Alms I was now ready to repair the closet." Contention was made in that case that the mere statement of defendant that he gave the contract for the work to Cotter raised the presumption that the relation between defendant and Cotter was that of contractor and contractee and not that of master and servant. The court disposed of this contention by saying: "Such is not our opinion. Prima-facie a person found doing a service for another is in the other's employ. [Wood on Master and Servant, p. 584.]" The court further said:

"It cannot then be presumed that Cotter was a contractor and not a servant from the mere general statement by defendant, that he had given the contract to Cotter. But if the defendant wants to relieve himself of liability as master in this case by reason of the relation of contractor, the defendant must prove the existence of that relation. If the defendant wants to escape liability because

by the terms of the contract his liability has been imposed upon Cotter, he must prove the terms of the contract. From the evidence in this case the terms of the contract do not appear and we cannot say that Cotter was not defendant's servant. The presumption is that Cotter was such servant. The evidence does not tend to rebut that presumption."

In 39 Corpus Juris, section 1582, page 1356, it is said: ". . . if defendant claims that he is not liable because the work was being done by an independent contractor, the burden is on him to prove such relationship, especially where a prima-facie case to show the relation of master and servant is made out, and where the facts recited are as consistent with the theory of the relation of master and servant as with that of independent contractors."

The same conclusion is reached by the Kansas City Court of Appeals in Knoche v. Pratt, 194 Mo. App. 300, 304, 305, 187 S. W. 578.

In the instant case, the only evidence bearing on the relation between appellant and defendant Pfaff, is the testimony of Pfaff, who said that he was sales manager and city salesman for appellant and at the time his car struck the plaintiff he was on his way from his office to call on a regular customer of appellant for the purpose of selling this customer a bill of goods for appellant. This evidence shows that Pfaff was in appellant's employ as salesman and at the time in question was using the car in the performance of a service for appellant. Neither the terms of the contract of employment nor the manner in which Pfaff should perform his duties as salesman appear from the evidence. On a bare showing of employment and rendition of service by the employee under such employment, we cannot say as a matter of law that Pfaff was not appellant's servant. The rule is that the relation of master and servant is prima-facie established by a showing that the alleged servant was performing labor for defendant at the time of the injury. [39 C. J. sec. 1590, p. 1361; Perry v. Ford, supra.]

The mere fact that appellant did not own the automobile causing plaintiff's injury will not preclude a recovery by the plaintiff. The evidence tends to show that the automobile was used in appellant's business with its knowledge and assent. In fact appellant paid the cost of upkeep on the car in consideration of use thereof in its service. "Where, with the express or implied assent of the employer, the employee uses a vehicle which the employee owns in the discharge of his duties, the employer will be liable for any injury occasioned by its negligent operation by the employee while acting within the scope of his employment." [42 C. J. sec. 900, p. 1128; 6 Labatt on Master and Servant, sec. 2282.]

The evidence showed that Pfaff was appellant's regularly employed salesman, and was operating the car in the performance of

his duty to his employer at the time it struck and injured the plaintiff. This showing established prima-facie the relation of master and servant between appellant and pfaff and warranted the submission of the case to the jury. [Authorities supra, and Gordner v. St. Louis Screw Co., 210 S. W. 930, 201 Mo. App. 349; Koelling v. Union Fuel & Ice Co., 267 S. W. (Mo. App.) 34; Burgess v. Garvin, 272 S. W. (Mo. App.) 108; Hoelker v. American Press, 296 S. W. 1008.]

Appellant cites Pyyny v. Loose-Wiles Biscuit Co., 149 N. E. 541 (Mass.); McCarthy v. Souther, 137 Atl. 445 (N. H.); Barton v. Studebaker Corp. of America, 189 Pac. 1025 (Cal.); Premier Motor Mfg. Co. v. Tilford, 111 N. E. 645 (Ind.); Aldrich v. Tyler Grocery Co., 89 So. 289 (Ala.); Harris v. McNamara, 12 So. 103 (Ala.); Lookout Mt. Iron Co. v. Lea, 39 So. 1017 (Ala.); Republic Iron Co. v. McLaughlin, 75 So. 962 (Ala.); Fink v. Furnace Co., 82 Mo. 276; Goodrich v. Musgrave Fence & Auto Co., 135 N. W. 58 (Iowa); Western Indemnity Co. v. Pillsbury, 159 Pac. 721 (Cal.); Singer Mfg. Co. v. Rahn, 132 U. S. 1. c. 523; Crenshaw v. Ullman, 113 Mo. 638; Schroer v. Brooks, 224 S. W. 53 (Mo.); Kipp v. Oyster, 133 Mo. App. 711; Jackson v. Butler, 249 Mo. 342; Hopkins v. Empire Eng. Co., 137 N. Y. Supp. 478, in support of his contention that the relation of master and servant was not shown because there was no evidence tending to show that appellant had the right to direct and control the operations of its employee, Pfaff.

These cases with the possible exception of McCarthy v. Souther, do not hold that proof of employment and rendition of service under that employment does not show prima-facie the relation of master and servant. In fact they do not pass on that question one way or the other. The effect of what they do hold is that where the evidence shows without substantial contradiction that the employer has no right to direct or control the operations of the employee, it is the duty of the court to direct a verdict for defendant.

McCarthy v. Souther, supra, seems to lend color to appellant's contention, but it is out of line with the weight of authority and should not be followed.

The next contention is that the court erred in admitting incompetent and prejudicial evidence testimony over appellant's objection.

On cross-examination of defendant's witness, A. L. Hence, plaintiff's counsel asked the witness if in 1910 he was arrested and later adjudged insane and committed to the insane asylum at Little Rock, Arkansas, by the circuit court of Arkansas.

Appellant's counsel objected to this question on the ground that it did not call for the best evidence and because it was an attempt

to prejudice the jury against the testimony of the witness, but before the court ruled on. the objection, counsel made the following statement in the presence of the jury:

"It is my understanding, although I have no authority or proof of it, and I am not in a position to admit it, because I do not know the truth of it—it is my understanding, however, that this witness was committed to the insane asylum in 1910 for a short time; but, of course, your Honor understands in offering him as a witness, which I have a perfect right to do, I am simply offering him to the jury for their consideration, for such value as they wish to give to his testimony, and if they seek to establish his insanity now we are ready to meet that issue and prove he is competent to give testimony.

"If they want to show he was in an insane asylum they should go about it in the regular and lawful way. I am not trying at all to keep the facts from your Honor and the jury. I would readily admit Mr. Hence was in the insane asylum in 1910 if I positively knew that was true, but I do not know that is positively true, but if I did admit it that would not render him incompetent as a witness. Your Honor understands that. Mr. Friday showed me a copy of the records of the insane asylum showing in 1910 he was in the insane asylum."

After this statement was made the court overruled the objection and the witness answered that he was sick and was in the asylum for eight days. It clearly appears from the statement made by appellant's counsel that he did not object to plaintiff showing that the witness was in the insane asylum in 1910 provided it be shown by the record instead of by the verbal testimony of the witness. Counsel frankly stated that it was not his purpose to keep such facts from the court and jury. He further stated in the presence of the jury that plaintiff's counsel showed him a copy of the record of the insane asylum showing that the witness was in said asylum in 1910. If erroneous, it would not be prejudicial to permit the witness to state that he was confined in an insane asylum for a period of eight days, when appellant's counsel had theretofore stated in the presence of the jury that the records of the insane asylum showed that fact.

The next and last contention is that the verdict is excessive.

Plaintiff's injury was a fracture of the right hip—a complete fracture of the femur. On the day following the injury he was removed to the hospital and the fracture was reduced and his body and right leg was placed in a plaster-of-paris cast which remained on him for fourteen weeks when it was removed and a Bradford splint applied. The splint was kept on his leg for ten weeks. It was discovered by means of X-ray pictures that there was no bone union. The splint was then removed and an operation was performed. The hip was opened and it was dis-

covered that the neck of the femur was not growing, but on the contrary was absorbing, that is, getting shorter from both ends. That part of the bone which was affected by the fracture was removed, and holes were drilled in the head of the femur and in the broken end of the shaft, and a peg or pin made from a piece of bone taken from the tibia of plaintiff's right leg was driven into the holes which had been drilled to hold the broken ends of the femur together. After the incision in plaintiff's hip healed he was again placed in a cast and kept there for eighteen weeks, when the cast was removed and the Bradford splint again applied, which he was wearing at the time of the trial. Plaintiff was confined to his bed from the date of his injury to the date of the trial. He testified that he was nervous and shaky and could not eat or sleep and suffered pain all of the time. Dr. Lippe attended plaintiff continuously from the date of his injury. He testified that at the time of the trial there was very little, if any, bone union; that plaintiff suffered an injury to his nervous system, by reason of the pain and long confinement in a cast and in a brace; that he would require a great deal of medical and surgical attention in the future; that he suffered pain; that he would not say absolutely that his present condition was permanent, but the outlook was not very good; that it would be more than a year before he could do any work.

Dr. Klinefelder, a bone specialist who performed the operation on plaintiff, testified that the bones were in apposition and there might or might not be some new growth of bone, he could not tell; that if the bones did unite it would be eighteen months from the date of the operation before he could get out; that he could not say whether the bones would ever unite; that he could only give reasons for thinking one way or the other; that a favorable sign of bone growth was the fact that the bone graft which was put in was staying well in position, but the unfavorable evidence was that the neck of the femur was becoming smaller instead of thicker, was not being properly nourished and was not showing any evidence of its growing around it; that if there was no further bone growth, but two things could be done, one to leave it as it is, the other to perform another operation and remove the head of the bone and put the upper end of the shaft in the socket; that so far as he knew the result of such an operation was an unsolved problem. He further testified that it would be about one year before plaintiff could bear any weight on his leg; that he suffered pain as a result of his injury and would probably suffer in the future.

The evidence shows that plaintiff was forty-three years of age and at the time of his injury was earning $44 per week as a tailor, operating a power machine which required the use of his right leg. At the date of the trial his doctor bills amounted to $17.00, hospital bills

$990.10 and loss in wages $2464, making his total cash loss at the time of the trial $5154.10. The evidence is that if the bones unite and he makes a successful recovery he would not be out and able to bear weight on his foot for one year after the trial. He would necessarily lose his wages for that year which would amount to $2288, and his hospital bill, or care at home or elsewhere, which the evidence shows he would need would amount to $936, making a total loss of $3224 for that year, and this amount does not include any medical or surgical attention, which the evidence shows he would need during that year. His total cash loss from the date of his injury to the time he would be able to get out and bear any weight on his injured leg, in event the bones united would be $8378.10.

Dr. Klinefelder testified that the X-ray pictures showed definite atrophy or wasting of the neck of the femur on both sides of the fractured area. Concerning the probability of the bones uniting, he said:

"Q. Are there any unfavorable factors? A. Yes, sir.

"Q. What are they? A. The one important point is the evidence that some bones will not grow; in this case his would not grow when it was absolutely in perfect position, so far as you could determine from many X-rays, and if it would not grow once, I would not want to offer any great encouragement it would grow a second time. The original bone would not grow for me, and, of course, the environment was more favorable for it then than it is for another piece of bone moved over."

The evidence was sufficient to warrant the jury in concluding that there would never be any bone union. Relative to what plaintiff's condition would be in event the fractured bone did not unite, Dr. Klinefelder said:

"Q. Assuming, doctor, that if the bone growth does not develop and prove successful, and there is no bone growth to aid in uniting the fragments, with that condition existing at the end of eighteen months from the date of operation, or two years from the date of operation, or such a matter, should he be able to walk on his leg some and use it some in the ordinary way which we use a leg? A. He should be able to get around. Some people use crutches, some use one cane and one crutch, and some use two canes, and some even walk in the room for a few steps without any aid. They cannot walk much without aid; but that is about the way.

"Q. You have no fixed rule; in other words, depending upon the patient? A. Take a dozen cases of ununited fracture of the femur it would run about even—one with two crutches, one with one crutch and one cane, and one with two canes."

A fair consideration of the evidence justifies the conclusion that the fractured bone in plaintiff's hip will never unite and that he

has lost the use of his right leg for all practical purposes. He was confined to his bed from the date of his injury to the date of the trial which occurred more than a year after his injury. His nervous system was injured. At the time of the trial he was nervous and shaky and could not eat or sleep. His body and right limb was encased in a plaster cast for eight months and he wore a heavy steel splint the remainder of the time. Some months after his hip was set, he was subjected to a severe surgical operation which did not result successfully. The jury assessed his damages at $27,500. When the $8378.10 which the evidence shows will be his actual loss in wages, hospital bills and doctor bills, before he will be able to get out, is subtracted from the amount the jury awarded, it leaves $19,122.90 to compensate him for the pain and suffering he has and will endure, the injury to his nervous system, his permanent crippled condition and his permanently reduced earning capacity, due to the loss of the use of his leg. Considering the purchasing power of money at this time, we are not persuaded that the verdict exceeds the compensation to which plaintiff is entitled for the injury and loss he has sustained.

We find no reversible error in the record and accordingly affirm the judgment. All concur.