GEORGE E. McNATT v. WABASH RAILWAY COMPANY. Appellant.—74 S. W. (2d) 625.

Division One, September 18, 1934.*

---

*NOTE: Opinion filed at May Term, 1934, July 17, 1934; motion for rehearing filed; motion overruled at September Term, September 18, 1934.

*N. S. Brown* and *Homer Hall* for appellant.

*Eagleton, Henwood & Waechter* and *Frank P. Aschemeyer* for respondent.

STURGIS, C.—In this case plaintiff sues for damages for personal injuries caused by defendant's negligence. It is alleged that at the time plaintiff's injuries were so received and inflicted the plaintiff and the defendant were engaged in interstate commerce and in handling, moving and switching cars moving and destined in interstate commerce. The case is therefore under and governed by the Act of Congress regulating interstate commerce, known as the Federal Employers' Liability Act. The defendant denies that at the time the plaintiff was injured he and defendant railroad were engaged in interstate transportation of freight, and denies that the freight cars being handled, moved and switched at the time plaintiff was injured were moving or destined in interstate commerce, but were moving only in intrastate commerce, and therefore that plaintiff cannot recover in this action. The court by its instructions to the jury permitted it to return a verdict for plaintiff, which it did, and the defendant by this appeal challenges the right of plaintiff to recover under the Federal act in question. This is the question for our first and perhaps only consideration and determination.

The undisputed facts are, that on the occasion in question the defendant was operating a freight train on its line of railroad running from Moberly, a division point, to St. Louis; that is, the engine and train crew operated between such points. This train, consisting of some thirty or more freight cars, may be properly designated as an interstate train in that some at least of the cars and freight being moved were interstate shipments, being cars loaded with live stock destined to the Union Stock Yards in East St. Louis, Illinois. Other cars doubtless contained freight originating or destined to points beyond this State. This train was also designated as a local freight in that it stopped at various local stations between Moberly and St. Louis to deliver or take on cars of freight destined to or loaded at such local stations; and it did switching and spotting of freight cars at the various local switch yards. The crew of such train consisted of the engineer and fireman operating the engine and at least two or perhaps three brakemen who performed the usual duties of brakemen and acted as switchmen in the switching operations. Plaintiff was one of these brakemen. This train arrived at the station of Anglum, in the north part of St. Louis County, about ten or eleven o'clock on the night of February 20, 1929, and during the course of the freight car movements at that station the plaintiff received the injury for which he asks damages. At this point were located two large airplane plants or factories and it is a matter of some human interest, stated to be true, that here was constructed the famous "Lone Eagle" in which Lindbergh made the first successful flight across the Atlantic Ocean. The point of interest here is that at this point are manufactured or constructed airplanes and their constituent parts and such here enter into commerce for railroad transportation.

At this point defendant railroad maintained a passing track switch parallel with and connected at either end with the main line running east and west. It also maintained a stub track or industrial switch connected with the passing track, both switches being on the south side of the main line, and this industrial switch track extended a half mile or more south and east, connecting the passing track and main line with the loading platforms of these aircraft factories.

On the night in question there were several freight cars on this industrial switch, but only two of which are important to be considered. One of these was a loaded freight car ready to be taken out and transported to St. Louis and, as plaintiff contends, destined to Arlington Heights in Illinois. This car was furthest east from the switch connection, being near the east end of this stub switch, and the other cars were between the stub switch connection and this loaded car. This loaded car was to be taken out and put in the train for transportation to St. Louis. The other car important in this transaction was next to the loaded car on the west and was an empty furniture or automobile car some fifty feet long. This car was to be placed or "spotted" at one of the aircraft factories for future loading. The train crew was therefore charged with two duties or objects to be accomplished—the taking out and further transportation of the end or loaded car and the placing or spotting of the large empty car at the aircraft factory for future loading. To accomplish this the train was left standing on the main line west of the switch connection. The engine, headed east, was then run in on the passing track and through a switch onto the stub or industrial track. The freight cars standing on this stub track were then shoved together and pushed east till connection was made with the loaded car near the east end, the large car to be spotted being next to it. Next that string or drag of cars was pulled, the engine backing, till all were on the passing track west of the switch connection with the stub or industrial track. The loaded car was then the last or furthest east of that string or drag of cars and the large car to be spotted was next to it. This loaded car was then kicked or pushed east on the passing track past the switch connection with the stub track and a brakeman stopped it there to be picked up later and put in the train. The next movement was to spot or place the large furniture car at the loading platform of the aircraft factory near a half mile east on the industrial track. The plaintiff brakeman now, if not before, took charge of the further movement, again opened the switch to the industrial track, and signaled the engineer to again run the string of cars, the large one to be spotted being now at the east and furthest from the engineer, so as to spot this large car at the proper place to be loaded. As this drag of cars started in on the stub track plaintiff climbed on the side ladder of this large car so as to signal the engineer as to further movements, and the string of cars with plaintiff riding on the end one

furthest east was pushed by the engine through the switch and on east toward the aircraft plant. In making this last movement and before the large end car to be spotted and on which plaintiff was riding reached its destination, this car was derailed, resulting in plaintiff's injury.

Granting that the loaded car originally at the east end of those on the industrial switch was being moved in interstate commerce, there was no such showing as to the other freight cars on that switch, including the large automobile car next to it and which was to be spotted or placed for future loading and on which plaintiff was riding when injured. The evidence shows that there were two separate movements, each a movement in on the spur track, the first for the purpose of taking out the loaded car for further transportation and the second for the purpose of spotting the large furniture car for future loading at the aircraft factory. Such is plaintiff's evidence and such was plaintiff's attorney's opening statement to the jury, speaking for plaintiff and doubtless on information received from him. The first movement was in interstate transportation, the movement of a car in interstate commerce; but when that loaded car was placed on the passing track to be picked up later and moved further as a part of the interstate train, that movement was complete and the engine and crew turned aside to make an intrastate movement of other cars in placing or spotting the large car for future loading.

The defendant and this train and train crew, speaking generally, were engaged in both interstate and intrastate freight shipments and as the power of Congress over commerce is limited to regulating interstate commerce, the distinction must be drawn as to what is and what is not interstate commerce. In Milburn v. Chicago, M., St. P. & P. Railroad Co., 331 Mo. 1171, 56 S. W. (2d) 80, this court said: "This is necessary because the question is the fundamental one of jurisdiction. If the employee is not engaged in commerce 'among the several states,' Congress has no authority to legislate concerning his rights and remedies for injuries sustained. [Article 1, Sec. 8, Clause 3, Constitution of the United States.] Likewise, if he is so engaged, since the entire subject of injuries in interstate commerce is so completely covered by Federal Acts, the states cannot make any provisions concerning them regardless of whether or not Congress has provided liability for every injury. [New York Cent. Railroad Co. v. Winfield, 244 U. S. 147, 61 L. Ed. 1045, 37 Sup. Ct. 546.] It is, therefore, the nature of the work which the employee was doing *at the time of the injury* and not what he later expects to do (or had been doing) which determines the question." It is not always easy to draw the distinction between what movements of freight and the instrumentalities thereof are to be classed as interstate and what intrastate. It is a Federal question

and the ruling of the Federal courts are controlling. In the case of New York Cent. & H. Railroad Co. v. Carr, 238 U. S. 260, 59 L. Ed. 1298, the court said: "The scope of that statute (Federal Employers' Liability Act) is so broad that it covers a vast field about which there can be no discussion. But owing to the fact that, during the same day, railroad employees often and rapidly pass from one class of employment to another, the courts are constantly called upon to decide those close questions where it is difficult to define the line which divides the State from interstate business. The present case is an instance of that kind—and many arguments have been advanced by the railway company to support its contention that, as these two cars had been cut out of the interstate train and put upon a siding, it could not be said that one working thereon was employed in interstate commerce. But the matter is not to be decided by considering the physical position of the employee at the moment of injury. If he is hurt in the course of his employment while going to a car to perform an interstate duty; or if he is injured while preparing an engine for an interstate trip he is entitled to the benefits of the Federal Act, although the accident occurred prior to the actual coupling of the engine to the interstate cars. (Cases cited.)" The cardinal rule for determining when a carrier and its servant is or is not engaged in the one or the other class of commerce, interstate or intrastate, is to determine the character of the transportation movement at the very time of the injury. The language of the Congressional Act in question makes the common carrier liable to its employee only upon such employee "suffering injury while he is engaged by such carrier in such (interstate) commerce." As said in Pope v. Utah-Idaho Cent. Railroad Co., 54 Fed. (2d) 575, "This, it seems to us, ignores the plain requirements of the first section of the act under which the suit was instituted. It is not a question of intention as to *future movements*, in which, as it turned out, plaintiff took no part. The plain language of the section makes the carrier liable to the employee only upon his 'suffering injury while he is employed by such carrier in such (interstate) commerce.' On the facts stated neither the railroad company nor plaintiff were engaged in such commerce when the injury was suffered." In Middleton v. Southern Pac. Co., 61 Fed. (2d) 929, the Circuit Court of Appeals said: "It is settled law that the work which one is actually doing at the time of the injury, and not the work which he expects to do, determines whether he is engaged in interstate commerce (Illinois Central v. Behrens, 233 U. S. 473, 58 L. Ed. 1051), and that the mere expectation that one previously, but not presently, engaged in such commerce, would in the immediate future return to it, is not sufficient to bring the case within the act. (Cases cited.) . . . It has been repeatedly held that the true test is the nature of the work actually

being done at the time of the injury, not what the employee might do, or was expecting later to do." In Erie Railroad Co. v. Welsh, 242 U. S. 303, 61 L. Ed. 319, the United States Supreme Court announced the rule thus: "By the terms of the Employers' Liability Act the true test is the nature of the work being done at the time of the injury, and the mere expectation that plaintiff would presently be called upon to perform a task in interstate commerce is not sufficient to bring the case within the act," nor is the fact that the employee has just finished such a task sufficient.

This court in the recent case of Howard v. Mobile & Ohio Railroad Co., 335 Mo. 295, 73 S. W. (2d) 272, had occasion to consider this question and quoted the pronouncement of the United States Supreme Court in Erie Railroad Co. v. Welsh, supra, that "The criterion of applicability of the (Federal) statute is the employee's occupation at the time of the injury in interstate transportation or work so closely related thereto as to be practically a part of it. [New York, New Haven & Hartford Railroad Co. v. Bezue, 284 U. S. 415, 76 L. Ed. 370; Chicago & Eastern Ill. Railroad Co. v. Industrial Commission, 284 U. S. 296, 76 L. Ed. 304.]" In the Howard case the engine and crew were primarily engaged in moving and breaking up a drag of cars, part of which were interstate shipments, but while so doing and before finishing that job temporarily turned aside to switch some other empty cars from one track to another and then resumed the interstate movement. This court there said: "The evidence further clearly tends to show that, while waiting for the inspection and marking (of the interstate cars) to be completed, which had to be done before the switching crew could further move the interstate cars, the switching crew merely moved aside from the interstate work, upon which they were engaged and which they were to continue immediately upon the completion of the inspection and marking, to perform another task which was intrastate in character; that they had completed this work by kicking the empty cars onto the house track; and that they had commenced to move again toward their interstate work with the purpose of continuing it. . . . They were temporarily interrupted in carrying their orders to immediate completion, because it was necessary to have the cars inspected and marked before they could do so. While waiting to continue and complete this interstate work in compliance with their switching list, they merely moved aside to perform a task which was intrastate, and which apparently had no connection with their interstate work. Under these circumstances, when they completed that merely intervening task and began to move again in the direction of the interstate work, which they had been directed to do and which was the principal mission they had been sent out to perform, for the purpose of continuing it and completing their orders in regard

to it, they were engaged again in the work of interstate transportation.''

Analyzing the two separate movements of the engine and train crew in the present case in going in on the stub switch, the first movement was for the purpose of taking out a loaded car ready and destined for shipment into another state. That whole movement, going onto the switch, backing the intermediate cars and coupling same to the loaded car and pulling the whole string out onto the passing track, was a movement in interstate commerce, the object being to put the loaded interstate car into the interstate train. For convenience, no doubt, the loaded interstate car was then shoved on the passing track beyond the switch connection with the spur track to await the disposition of the intervening intrastate cars also on the passing track before placing the loaded car into the train on the main track. The first movement, however, may be considered complete and the loaded car, for practical purposes, was put in the interstate train. The next movement was to spot or place the large automobile car at the loading platform of the aircraft factory on the stub switch for future loading. That car and the others in the drag (after the loaded one was placed by itself on the passing track) were not assigned or destined for interstate commerce, so far as the evidence shows. The second movement was of these intrastate cars from the passing track onto the stub track for the purpose of spotting or placing the large end car at the proper place for loading. What was further to be done with that car is not shown. Plaintiff insists that this second movement of cars onto the stub switch was merely to get them off the passing track and out of the way of moving the loaded car into the train standing on the main track, and if that was the purpose it might well be argued that such movement was a mere incident and a reasonably necessary part of the larger movement of placing the loaded car into the train and therefore incidental and part of an interstate movement. If that was true, a different situation would be presented and a different result might be reached, but here plaintiff testified:

''Q. Where was that car (the loaded one) destined? A. Arlington Heights, Illinois.

''Q. Had you discussed with the foreman before you went in there the manner of handling the work that evening? A. Yes, sir.

''Q. After cutting your car for Arlington Heights out there on the passing track, you started in again on this same spur from the passing track? A. Yes, sir.

''Q. And moved in east, did you? A. Yes, sir.

''Q. What was your—what was the next move that you made after you went in to this Ryan-Mahoney spur track the second time,

with reference to picking up that Arlington Heights car, if there was any move to be made again with it? A. We shoved back and *spotted an empty that was next to it*, the same type car, *to load airplanes in.*"

Plaintiff gave other evidence to the same effect and in his opening statement to the jury plaintiff's attorney said:

"There were a number of cars in between; so when they hooked up with this particular car they pulled out with a whole cut and got back onto the main line, or passing track, as they call it, that is. near the main line; they kicked this one car out; by 'kicking' they detach the coupling pin and give it a kick and it rolls down; then they *went in the second time to spot these other cars so that they could be loaded up properly*. So it was the second trip in. That is. the point I am trying to get into your minds."

This statement of plaintiff's attorney may be taken as binding on the plaintiff. [Hampe v. Versen (Mo. App.), 32 S. W. (2d) 793, 795; Pratt v. Conway, 148 Mo. 291, 49 S. W. 1028; Eaton v. Curtis, 319 Mo. 660, 671, 4 S. W. (2d) 819; Cole v. St. Louis-San Francisco Ry. Co., 332 Mo. 999, 61 S. W. (2d) 344, 346; Oscanyan v. Arms Co., 103 U. S. 261, 26 L. Ed. 539.] The fact that some of the freight cars. intervening between the engine and the two cars at the further end of the drag, which and whose movements we have mentioned, were to be again taken onto the passing track and with the loaded car placed in the train for direct transportation to St. Louis, is of no significance here since nothing was shown as to such cars being loaded or whether they were to go outside of this State. They must. be regarded as intrastate cars.

The facts of this case are quite similar to the facts in Phillips v. Union Terminal Ry. Co., 328 Mo. 240, 40 S. W. (2d) 1046. In that case an engine and train crew, of which plaintiff was one, was assigned the duty of handling a string of eight cars, three of which were empty intrastate cars and the other five were loaded interstate cars to be delivered to the Great Western Railroad. In order to deliver the interstate cars to the Great Western, the first movement was to get the three empty intrastate cars out of the way and they were moved onto a switch track leading to a sand company's yard,. ultimately to be loaded with sand. Desiring to deliver the five loaded interstate cars to the Great Western speedily, the three empty cars were merely shoved on the sand company's switch. track and so left: as to block a public road crossing. The five loaded interstate cars were then moved and delivered to the Great Western for further transportation by it. That movement was interstate commerce and was completed. Next the engine and crew returned to the sand company's switch and proceeded to move the empty cars placed there partly at least so as to unblock the public road and partly to place such cars for future loading with sand. It was during this last move-

that plaintiff suffered injuries. This court held that plaintiff was not engaged in interstate transportation at the time injured. It quoted the rule laid down in Shanks v. Delaware, Lackawanna & Western Railroad Co., 239 U. S. 556, 558, 60 L. Ed. 436, that "The true test of employment in such commerce in the sense intended is, was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it." The court then further said: "Plaintiff contends that opening the crossing after the delivery to the Great Western was incidental to and practically a part of said delivery, for the reason said work (opening the crossing) was deferred to hasten delivery to the Great Western. In other words, the contention is an effort to unite the movement to open the crossing with a particular movement in interstate commerce. Opening the crossing did not partake of the work as a whole. Plaintiff controlled the order of the different movements directed by the switch list, and it may be that the delivery to the Great Western was hastened by deferring the opening of the crossing. If so, the act of deferring the opening of the crossing was in furtherance of interstate commerce, for it occurred before the completion of the movement in interstate commerce. But after the delivery of the cars to the Great Western, there was no interstate movement with which the movement of the cars to open the crossing could be connected. How could a movement of cars be connected with no movement? Furthermore, after the delivery of the interstate cars, the fact that the crossing was blocked did not further or interfere with a movement or movements in interstate commerce. We do not think plaintiff was employed in interstate commerce at the time of his injury." [Certiorari denied, 284 U. S. 660.]

It is unquestioned that the large freight car on which plaintiff was riding at the time of his injury was not shown to be moving in interstate commerce. Nor was such movement a part of the prior movement in going in and taking out of the stub switch the loaded interstate car. Nor was it so closely connected therewith as to be practically a part thereof, or, expressing it in the language of the Congressional Act, the plaintiff did not "suffer an injury while he was employed by such carrier in such (interstate) commerce." Under this view of the case, it is not necessary to consider other questions presented. The judgment must therefore be reversed and cause remanded. It is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by Sturgis, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.