GEORGE E. McNATT v. WABASH RAILWAY COMPANY, Appellant.—108 S. W. (2d) 33.

Division One, July 30, 1937.

518

*N. S. Brown, R. B. Elster* and *Homer Hall* for appellant.

*Eagleton, Waechter, Yost, Elam & Clark* for respondent.

BRADLEY, C.—Action for personal injuries under Federal Employers' Liability Act. [45 U. S. C. A., Secs. 51-59.] The jury returned a verdict for $35,000; judgment was entered in accordance with the verdict, and defendant appealed.

Plaintiff was a brakeman on what may be called a pick-up and setout train, running between Moberly, Missouri, and St. Louis. The crew consisted of the engineer, fireman, conductor and three brakemen. Plaintiff alleged that at time of his injury he and de-

fendant were engaged "in interstate commerce and transportation," and, as to negligence, went to the jury on the charge that the engineer negligently drove the engine and cut of cars "at an excessive and dangerous rate of speed under the circumstances there." The answer was a general denial, a specific denial that plaintiff was engaged, at the time of injury, "in interstate commerce and transportation," and pleas of contributory negligence and assumption of risk. The reply was a general denial.

Error is assigned (1) on the overruling of defendant's *ore tenus* demurrer to the petition; (2) the refusal of demurrer to the evidence at the close of the whole case; (3) on instructions 1 and 2 given for plaintiff; (4) on admission of evidence; (5) on argument of counsel, and (6) on an alleged excessive verdict.

This is the second appeal in this case. On the former appeal the judgment for plaintiff was reversed and the cause remanded. [See McNatt v. Wabash Ry. Co., 335 Mo. 999, 74 S. W. (2d) 625.] On the former appeal the judgment, by the opinion as first filed, was reversed outright, but on motion for rehearing the opinion was modified by remanding. It is apparent, from the former opinion, that the result reached, in the first instance, reversing outright, was on the theory that plaintiff did not make a prima facie case on the question as to whether, at time of injury, he was engaged in interstate transportation or in work so closely related thereto as to be practically a part of it.

The *ore tenus* demurrer to the petition was based on the theory that the law, as applied to the facts, in the former opinion, was the law of the case, which, of course, is generally true, absent change in the pleading or evidence. After the cause was remanded, plaintiff amended his petition, and the evidence on the question of interstate work is different than in the record on the first appeal. The trial court, in ruling the *ore tenus* demurrer, could not anticipate that the evidence would be the same on the second trial as on the first. Also, it is apparent that the opinion on the former appeal was modified to the extent of remanding, with the idea that plaintiff probably, on a second trial, could make an issuable fact on the question stated. It is not infrequent that causes are remanded, instead of reversing the judgment outright, when it appears from the record or by suggestion that a submissible case may be made, and this is done on occasions without regard to amendment of pleadings. If a case could not be retried under such circumstances as obtained when the *ore tenus* demurrer was interposed, then such remand as in the former appeal would be futile. We think that the court properly ruled the *ore tenus* demurrer.

Did plaintiff make a submissible case on the question as to whether or not he was, when injured, engaged in interstate transportation or in work so closely related thereto as to be practically

a part of it? The train on which plaintiff was working, it is conceded, carried both intrastate and interstate freight and was, therefore, an interstate train. [Philadelphia & Reading Ry. Co. v. Hancock, 253 U. S. 284, 40 Sup. Ct. 512, 64 L. Ed. 907, and cases there cited; Youngstown & Ohio River Railroad Co. v. Halverstodt (C. C. A.), 12 Fed. (2d) 995.] According to plaintiff, the principal duty at any station on the run of this train was to set out cars from the train and pick up cars for the train, and this train, according to plaintiff, did no switching, unless ordered, except that necessary to set out and pick up cars.

Plaintiff was injured about ten P. M., February 20, 1929, at Anglum, a station in the northern part of St. Louis County. The train was on the run from Moberly to St. Louis. At Anglum, the crew was to pick up certain cars. At this station, the main line extends east and west. The station is on the north side of the main line and about fifty feet west of a north and south highway. Immediately south of the main line is the passing track which is a mile or more in length and connects with the main line both east and west of the station. South of the passing track is a spur track that runs off, east of the station, from the passing track. The main line and the passing track are on the railroad embankment, but the spur track goes down from the embankment to a level sixteen to twenty feet lower than the embankment, according to plaintiff's estimate. The spur track, in going down the embankment and straightening out to the east, has a double or reverse ten degree curve. Along the south side of the spur track, and in close proximity thereto, and a short distance east of the last curve going east, is the Ryan-Mahoney airplane factory. Immediately east of the factory building and adjoining it is a platform extending east from the east side of the building. The floor of the platform is about the same height as the floor of a box car. The spur track, after passing the Ryan-Mahoney plant, extends east for about one-half mile to the Curtiss-Robertson airplane plant.

On arrival at Anglum, the train, consisting of thirty-three cars, stopped some distance west of the station. The engine was detached and plaintiff rode the engine to the station. The station agent was not on duty at that hour of the night. The engine was stopped at the station, plaintiff got off, "unlocked the waybill box and checked the waybills." From the waybills he ascertained that he had to get eight cars into the train at Anglum. According to plaintiff, these eight cars were on the spur track, and seven of them were somewhat bunched towards the west end. Some distance east of these seven cars, were five cars somewhat bunched, but none of these five was to go into the train. Further east and at the east end of the spur track, and at the Curtiss-Robertson plant, was a loaded interstate car which was to go into the train. This car was loaded with airplanes and was billed to Arlington Heights, Ill. After plaintiff got information as to what

was to be done at Anglum, the engine moved east, on the main line, to a point beyond the east connection of the passing track with the main line, and then backed onto the passing track, and continued backing to a point west of the spur track switch. This switch was thrown and the engine, headed east, went onto the spur track. On reaching the seven cars, these were pushed east until they reached the five undesired cars, and then the twelve were pushed on east to the desired car at the east end of the spur track, which car, as stated, was billed to Arlington Heights, Ill. Upon coupling up with the Arlington Heights car, the whole drag of thirteen cars was pulled west until the Arlington Heights car was on the passing track and west of the spur track switch stand. This switch was then adjusted and the Arlington Heights interstate car was kicked east on the passing track to a point east of the spur track switch stand. The engine then pushed the remaining twelve cars back on the spur track, the undesired five being in front, that is, at the east end of the twelve, and the desired seven being next to the engine. In this movement, plaintiff rode near the front end of the easternmost car, standing in the iron stirup or step, called the sillstep, on the south side of the car, and holding to the grabirons that went up the side of the car over the step. The sillstep extended about fourteen inches below the floor of the car. On this movement the car on which plaintiff was riding was derailed a short distance west of the Ryan-Mahoney platform, and plaintiff was caught between the derailed car and the platform and was seriously injured. The intention, as we read the record, was to dispose of the five undesired cars, and then back out with the seven desired, couple up with the Arlington Heights car, then on the passing track, and then couple up the eight desired cars with the train on the main line and proceed on to St. Louis.

On the former appeal it was stated (335 Mo. 999, 74 S. W. (2d) 1. c. 627) that it is the *character* of the work the employee is doing *at the time of injury* which determines whether such work is within the Federal Act, and not the *intention* as to future movements. But a present movement of noninterstate cars may be so related to interstate transportation as to make the present movement one in direct furtherance of interstate transportation. [New York Central & H. R. Railroad Co. v. Carr, 238 U. S. 260, 35 Sup. Ct. 780, 59 L. Ed. 1298; Youngstown & Ohio River Railroad Co. v. Halverstodt (C. C. A.), 12 Fed. (2d) 995; Pennsylvania Co. v. Donat, 239 U. S. 50, 36 Sup. Ct. 4, 60 L. Ed. 139; Rogers v. Mobile & Ohio Railroad Co., 337 Mo. 140, 85 S. W. (2d) 581; Gieseking v. Litchfield & M. Ry. Co., 339 Mo. 1, 94 S. W. (2d) 375; Howard v. Mobile & Ohio Railroad Co., 335 Mo. 295, 73 S. W. (2d) 272.] It is conceded that the *first* movement onto the spur track and all movements thereafter up to and including the kicking of the Arlington Heights car east on the passing track, were movements in interstate transportation. The

526

car on which plaintiff was riding was a large automobile car, and the record on the former appeal, it was stated (335 Mo. 999, 74 S. W. (2d) l. c. 628) that the second movement onto the spur track "was to spot or place the large automobile car at the loading platform of the (Curtiss-Robertson) aircraft factory . . . for future loading." ▮ We are not to be controlled by the record on the former appeal. Our ruling on the present appeal will be determined by the present record. In the present record, it appears that plaintiff testified that the purpose of going onto the spur track the second time was to get "rid of the five cars that I had no billing on. Q. In getting rid of these five cars, did you have to go in any particular distance with the five cars, in order to get rid of them, and, if so, how far in did you have to go? A. Just shove them in to get them out of the road, over the crossing. Q. You would have to go far enough to get them off the hill, would you not? A. Yes, sir. Q. Off of the curve? A. Yes, sir. Q. Would you have to go far enough east to get across the road crossing? A. Well, it is customary to put them somewhere near where we found them. It is always the custom of the railroad to put these back near where you find them, so it wont inconvenience people that are to use them next day. Q. In other words, you shove them far enough back in east so that the five cars that you did not want, but were attached to the seven cars that you did want, in your interstate train, you would shove them enough east to put them some place close to where you found them? A. Yes, sir. Q. Were you, at any time, or were you required at any time that night, or at any other time, to place this car (the large car) and actually switch it to the original identical position desired? A. No, sir. Q. Who did that work? A. The St. Charles local."

Defendant contends that the record shows conclusively that the *primary* purpose in going onto the spur track the second time was to *spot* the large car at the loading platform of the Curtiss-Robertson airplane plant at the east end of the spur track, and to leave the other four cars where they were before being moved. This contention is based principally on plaintiff's evidence at the former trial, on a statement which defendant's evidence tends to show was signed by plaintiff, and on a part of the opening statement by plaintiff's counsel at the former trial. At the second trial, the pertinent former evidence of plaintiff, the signed statement and the part of the opening statement of counsel were introduced.

As to the evidence of plaintiff at the former trial, the present record shows: "Q. Did Mr. Eagleton ask you (plaintiff) this question? 'Q. What was your—what was the next move that you made after you went into this Ryan-Mahoney spur track the second time, with reference to picking up that Arlington Heights car, if there was any move to be made again with it? A. We shoved back and spotted an empty that was next to it, the same type car, to load airplanes in.'

Did you make that answer to that question of your attorney at that time? A. I don't think I understood his question at that time. Q. Did you make that answer at that time? A. I might have made it, not understanding his question; I don't know. Q. Well, there is no understanding about your answer, is there: 'We shoved back and spotted an empty that was next to it, the same type car, to load airplanes in?' There is no doubt about your making that answer, is there? A. I might have said it; and I might not have. I don't recall now. Q. And the next question: 'Yes.' And did you not then continue your answer: 'A. And then we were supposed to back the five cars that is out there west.' Did you make that answer? A. I probably did; I don't remember. Q. Then didn't Mr. Eagleton ask you this question: 'Q. So that after you got your one car spotted—you say that was an empty—and then came out with the five, you would then pick up your Arlington Heights car and go over to the main line again?' And did you not then answer, 'Yes, sir?' A. Yes, sir.''

The statement which defendant's evidence tends to show was made by plaintiff, was taken at the hosital a few days after his injury, and consisted of a question and answer. The question was asked by defendant's trainmaster, and was taken down in shorthand and later transcribed. The statement is as follows: ''On February 20th you were required to do some picking up and so forth at Anglum? 'A. Yes, two cars, first out on east end of house track; five empties on the west end of the airplane spur, which we caught; either three or four cars between that and the loaded car spotted down at the platform, OS&L 160558, supposed to be spotted back to the platform, where we took the load away from; we headed down into airplane works, pulled the drag, kicked out the load, brakeman Durham riding it down passing track; I got on the head car, gave him a signal, started down toward airplane track *to spot the car*, we got down somewhere near the crossing and I felt wheel hit the ground; I knew I couldn't jump off, because it would catch me between platform, and I tried to go high, and I got one leg up, and about that time it hit me.' '' (Italics ours.)

The part of the opening statement made by plaintiff's counsel at the former trial and introduced at the second trial follows: ''In order to get that particular car (Arlington Heights car) which was down at the end, the engine came in this way; there were a number of cars in between; so when they hooked up with this particular car they pulled out with a whole cut and got back onto the main line, or passing track, as they call it, that is near the main line; they kicked this one car out; by 'kicking' they detach the coupling pin and give it a kick and it rolls down; then they went in the second time *to spot these other cars* so that they could be loaded up properly. So it was the second trip in. That is the point I am trying to get into your

minds. The particular movements can be described by the witnesses better than by myself. They were going in there the second time when this accident occurred." (Italics ours.)

Of the signed statement, plaintiff testified that he signed a blank piece of paper; that he remembered that the stenographer came to the hospital "and taken the statement;" that "he (stenographer) never had it typed out;" that he, plaintiff, was not given a copy of the statement; that he never saw the typed statement until the first trial; that he did not know who was present; that he did not remember much about the statement; that he was "just getting out from shock, and they was giving me hypodermics, and I don't know just what was happening."

Plaintiff contends that his former evidence is not conclusive upon him and that the same is true as to the alleged written statement and the opening statement of his counsel at the former trial. "The general rule is that where a plaintiff at one hearing testifies in a given way, and at a later hearing testifies to the opposite, it is for the jury to determine what credence it will give to the evidence given before them, as impeached by what such party said at the previous hearing." [Davidson v. St. Louis-San Francisco Ry. Co., 301 Mo. 79, 256 S. W. 169, l. c. 171; Steele v. Kansas City Southern Railroad Co., 302 Mo. 207, 257 S. W. 756; Bloecher v. Duerbeck, 338 Mo. 535, 92 S. W. (2d) 681, l. c. 686; Kinghorn v. Penn. Railroad Co. (C. C. A.), 47 Fed. (2d) 588; Parrent v. Mobile & O. Railroad Co., 334 Mo. 1202, 70 S. W. (2d) 1068, l. c. 1075.] And the same is true as to the alleged statement of plaintiff. And certainly the statement of a party's counsel in an opening statement to a jury at one trial should not be conclusive at a second trial, when the evidence on the point is different. All these matters were proper subjects for consideration by the jury, but plaintiff, at the second trial, was not conclusively bound by them.

In Rogers v. Mobile & O. Railroad Co., 337 Mo. 140, 85 S. W. (2d) 581, cited, supra, the principal question was whether Rogers, at time of injury, was "engaged in interstate transportation or in work so closely related to such transportation as to be practically a part of it." In the Rogers case the southbound freight train left Jackson, Tennessee, for Okolona, Mississippi. In the train were several cars of interstate freight. Also, there were eight gondola cars which had been loaded with gravel at Johnsonville, Tennessee, and delivered to the defendant at Jackson, and there placed in its train. These gravel cars were billed to Selmer, Tennessee, but the crew got orders to set them out at Bethel Springs, Tennessee. When the train reached Bethel Springs, it had orders to go on the passing track so a freight train could pass. At Bethel Springs, the train went onto the passing track, which was west of the main line. West of the passing track was a house track upon which the intrastate gravel cars were to be

left. On the west side of the house track was the loading platform of a planing mill, and there was a box car on the house track by this loading platform, having been placed there to be loaded with lumber. Under the situation obtaining it was necessary to switch to the house track from its south end, and there was not enough room on the house track, south of the box car, to accommodate the gravel cars. The first movement was to take out the box car and couple it to the south gravel car. To make this movement, Rogers, head brakeman and in charge of the switching, went over to the house track and removed the derail south of the box car. He then went back, uncoupled the engine, and rode it south to the house track switch stand. He threw this switch, gave a backup signal and when the engine moved onto the house track, he got on it, rode north to the box car and coupled it to the tender. The box car was then pulled out south onto the passing track, and Rogers again threw the switch, gave backup signal, and the engine backed north on passing track with the box car to the standing train, where Rogers coupled the box car to the south gravel car. The conductor uncoupled the north gravel car, gave the go-ahead signal, which Rogers relayed to engineer, and the engine moved south past the house track switch stand with all nine cars. Rogers threw the house track switch for the next movement which was to back onto the house track until the box car was at the loading platform, the place where it had been, but with the gravel cars north of it. It was then intended to uncouple the engine, go back to the train and proceed on the interstate journey. The engine was not to move back onto the house track until Rogers gave a backup signal, but the engineer, without a backup signal, according to Rogers, moved back onto the house track, unknown to Rogers, and he was injured.

It was contended by defendant in the Rogers case that "when the train stopped on the passing track at Bethel Springs, and the engine was uncoupled from the train to commence the series of switching movements, necessary to set out the intrastate gravel cars on the house track, interstate transportation ceased, and the interstate cars in the train and the interstate freight in those cars remained at rest; and the work of the crew thereafter, in switching the intrastate cars, was solely for the purpose and had the sole result of intrastate transportation." Pertinent cases were cited and quoted in the Rogers case, and the conclusion reached that the question as to whether Rogers, at time of injury, was engaged in interstate transportation, or in work so closely related thereto as to be practically a part of it, was for the jury.

In New York Central & H. R. Railroad Co. v. Carr, 238 U. S. 260, 35 Sup. Ct. 780, 59 L. Ed. 1298, cited, supra, Carr was a brakeman on a pickup freight train running from Rochester to Lockport in New York. Some of the cars in the train contained interstate freight as in the present case. The two cars next to the engine carried only

intrastate freight, and these two cars were to be set out at North Tonawanda, New York. On arriving at that point these two cars were uncoupled from the train, pulled by the engine down the track and then backed into a siding. While doing this work, Carr was injured, and the contention was made that the work he was engaged in, at time of injury, was not such as to bring his case under the Federal Act. On this contention the court said: ''The plaintiff was a brakeman on an interstate train. As such, it was a part of his duty to assist in the switching, backing and uncoupling of the two cars so that they might be left on a siding *in order that the interstate train might proceed on its journey.* In performing this duty it was necessary to set the brake of the car still attached to the interstate engine, so that, when uncoupled, the latter might return to the interstate train and proceed with it, with Carr and the other interstate employees, on its interstate journey. . . . Each case must be decided in the light of the particular facts with a view of determining whether, at the time of injury, the employee is engaged in interstate business, or in an act which is so directly and immediately connected with such business as substantially to form a part or a necessary incident thereof. Under these principles the plaintiff is to be treated as having been employed in interstate commerce at the time of his injury. . . .'' (Italics ours.)

It is not necessary to review other cases. It is plain that for an employee to have been engaged in interstate transportation, or work so closely related thereto as to be practically a part of it, it is not in all cases, absolutely essential that he be, at the very moment of injury, handling cars *destined* beyond the State. [New York Central & H. R. Railroad Co. v. Carr; Youngstown & Ohio River Railroad Co. v. Halverstodt; Pennsylvania Co. v. Donat; Rogers v. Mobile & Ohio Railroad Co.; Gieseking v. Litchfield & M. Ry. Co.; Howard v. Mobile & Ohio Railroad Co., supra.] ''But while the specific act in progress at the moment of injury may be devoid of character as to commerce, or may tend to show that the employee's work was intrastate in nature, yet, if such act is considered as one step in a series of acts, it might clearly show the work to have been interstate in nature.'' [2 Roberts Federal Liability of Carriers (2 Ed.), sec. 727, p. 1374.]

It is our conclusion that the question as to whether or not plaintiff, at time of injury, was engaged in interstate transportation, or in work so closely related thereto as to be practically a part of it, was clearly for the jury.

It is contended that there was not any substantial evidence tending to show that defendant was guilty of any negligence which could be said to be the proximate cause of plaintiff's injury. As stated, supra, plaintiff went to the jury on the charge that the engineer negligently drove the engine and cut of cars (on the second trip

onto the spur track) "at an excessive and dangerous rate of speed under the circumstances there." Plaintiff's evidence was that when the car he was riding was derailed the cut was moving at twenty miles per hour. There was ample evidence that a speed in excess of ten miles at the place was unsafe, and the engineer, a witness for defendant, and in charge of the engine at the time, testified that he never went faster than ten miles an hour "down that hill or curve," and that the maximum speed there was "ten miles or slower." It also appears from plaintiff's evidence that he gave several slowdown signals when his signals should have been seen, but that the speed increased instead of diminishing. Obviously there is no substantial merit in this assignment.

Negligence of plaintiff, both on the theory of reduction and defeat of recovery, was submitted in defendant's given instructions, as was the subject of assumption of risk. We think it is sufficient to say that these questions were, under the evidence, proper questions for the jury.

It is our conclusion that the demurrer to the evidence was properly refused.

It is contended that plaintiff's Instruction No. 1 does not require a finding of facts necessary to constitute interstate commerce. In this respect the instruction required a finding that "both the plaintiff and defendant were then and there engaged in interstate commerce and transportation, and were engaged at said time in moving cars destined to states other than the State of Missouri." The ultimate fact to be found in the present case was whether or not plaintiff, at the time of injury, was engaged in interstate transportation, or in work so closely related thereto as to be practically a part of it, and as we have pointed out, the work being done, at the moment, is not always decisive. The specific work being done by plaintiff at the moment of injury was evidentiary of the ultimate fact to be found before plaintiff could recover. If defendant desired a more specific finding as to the *character* of work plaintiff was doing at time of injury, then it was its duty to submit such in an instruction. [Soltesz v. Belz Provision Co. (Mo.), 260 S. W. 990, l. c. 993; Brickell v. Fleming (Mo.), 281 S. W. 951, l. c. 959.] Other objections are made to Instruction No. 1, but we do not think they have substantial merit.

Plaintiff's Instruction No. 2, on the measure of damages, is challenged. It told the jury "that if you find under the evidence and instruction numbered one heretofore read to you in favor of the plaintiff, and further *find* that plaintiff at all times mentioned in evidence was in the exercise of ordinary care for his own safety, then in assessing his damages you will allow him such sum as will fairly and reasonably compensate him," etc. (Italics ours.) Then followed the separate items, designated as first, second, etc. Defendant

says that because of this instruction "the jury might well have understood" that instructions 1 and 2 were the *only* instructions necessary to consider. Instruction No. 1 was the only instruction that directed a verdict for plaintiff, and instructions 1 and 2 were the only ones given for plaintiff. It is difficult to appreciate how the jury could have got the notion from Instruction No. 2 that they could ignore defendant's instructions, and we think this complaint is without merit. Instruction No. 2 is further challenged on the ground that it did not require the jury to find *from the evidence* that plaintiff was in the exercise of ordinary care for his own safety. There is nothing in the instruction or any other to suggest that the jury *find* anything except from the evidence, hence we rule this complaint against defendant. [Ligon v. Exhibitors,' etc., Service Co. et al. (Mo. App.), 22 S. W. (2d) 1058.] It is further argued that Instruction 2 is bad in that "it authorized a recovery for plaintiff for loss of earnings at $240 per month from date of injury to time of trial and future loss at the same rate." It is claimed that there was no evidence to support the instruction in the respects mentioned. Plaintiff testified that at time of injury (February 20, 1929) he was earning about $240 per month; that thereafter he earned nothing until September 18, 1933, when he "started running a small filling station out in the rural district out of Moberly;" that the earnings of the filling station averaged about $40 per month; that his wife and her relatives helped at the filling station; and that he did about 50 per cent of the work. The jury was directed by Instruction 2, as appears, supra, that, if the finding was for plaintiff, "then in assessing his damages you will allow him such sum as will fairly and reasonably compensate him," etc., and then further on and under item fourth, the jury was directed as to loss of earnings, if the finding was for plaintiff, to find "for such loss of earnings, if any, as you may find from the evidence plaintiff has suffered by reason and on account of said injuries, if any, suffered on the occasion in question," but not "at a greater rate than $240 per month." It further appears that plaintiff's injuries were permanent. In this situation there was no error in Instruction No. 2 respecting the question in hand. [Hulsey v. Tower Grove Quarry & Construction Co., 326 Mo. 194, 30 S. W. (2d) 1018, l. c. 1031, and cases there cited.]

 Under the assignment on the admission of evidence, defendant challenged the competency of the evidence of plaintiff as to the destination of two of the cars in the bunch of seven. Plaintiff testified, over objection and exception, that two of the bunch of seven cars to go into the train were destined to points in Illinois. The objection was based on the contention that this evidence was secondary; that what information plaintiff had as to the destination of the two cars was derived from the waybills. These were not introduced and defendant says that proper foundation was not laid for admis-

sion of this evidence. Plaintiff contends that proper foundation was laid by the correspondence (introduced) between counsel as to the production of these waybills. As we read the record, plaintiff did not testify that he derived his information as to the destination of these two cars wholly from the waybills. The two cars in question were at the west end of the group or bunch of seven, and plaintiff testified that on the first trip onto the spur track he noticed that these two cars "were chalked; they have to put that marking on the end of a car, where it is going to, that chalk mark, and they (the 2 cars) were chalked to Dupo and East St. Louis, Illinois." In this situation, it is not necessary to rule the point on question as to the absence of the waybills. There could not have been any more shown by the waybills as to the destination of these two cars than was shown by the chalk marks. Plaintiff's case as to interstate work had to stand or fall on the primary purpose in making the second movement onto the spur track, and the evidence as to the destination of the two cars may have been immaterial and irrelevant, but such objections were not made. We do not think defendant was prejudiced by the admission of the evidence complained of.

Defendant further complains on the admission of evidence as to the condition of the spur track at time of plaintiff's injury. Plaintiff's witness, Martin, who had operated a railroad engine for about fifteen years, testified that he looked "over the place where the accident occurred" two years and three months after plaintiff's injury, and again shortly before the last trial, and that, in his opinion, "six to eight miles an hour should be the maximum speed around the reverse curve, and at no place, I don't think that track is good for over ten miles an hour," and that in his opinion a speed in excess of ten miles would cause a derailment. The point is that there was no substantial evidence tending to show that the condition of the track was the same when Martin saw it, as when plaintiff was injured. Plaintiff testified that he was at the spur track with Martin on the occasion of Martin's first visit, and that the track was in the same condition as when he was injured. Plaintiff's witness, Gibbs, testified that, at time of plaintiff's injury, he (witness) was in the employ of the Ryan-Mahoney airplane plant and that his duties required him to be on and about the spur track and platform where plaintiff was injured; that he was present "at that same platform" at time of Martin's first visit; and that the condition of the spur track was the same then as it was "for the whole length of time" he had worked there, and that he had been there six years. It was disclosed that plaintiff had not been over the spur track in daytime and that, for this reason, it is claimed, he was not qualified to testify as to the condition of the track, and defendant says, that neither plaintiff nor Gibbs "knew anything about the grade and curvature of the track or elevation of the rails at the curve;" and that their evidence

as to the condition of the spur track on the night of injury was a mere conclusion. We do not deem it necessary to rule this assignment, and this, because defendant's engineer, as appears, supra, testified that he never went faster than ten miles an hour "down that hill or curve," and that the maximum speed there was "ten miles or slower." When the evidence of Martin and Gibbs is considered along with the evidence of the engineer, their evidence is no more than cumulative, and, if erroneous, would not justify reversal. [Drake v. Kansas City Pub. Serv. Co., 333 Mo. 520, 63 S. W. (2d) 75, l. c. 81, cited, supra.]

Is the verdict excessive? As stated, the verdict was for $35,000, and judgment for that amount was entered. Plaintiff was thirty-four years of age at time of injury and was then earning "around $240 a month." His expectancy was 32.5 years. On the night of injury he was taken to hospital in St. Charles, and was there three days. He was then moved to hospital in Moberly, and was in hospital there for ten months and was treated by defendant's physicians.

Dr. J. F. Penrod, plaintiff's witness, testified that he first examined plaintiff, January 28, 1930; that at that time plaintiff walked "with the aid of a crutch and cane;" that his left leg was in a board splint from the ankle to the hip; that the left leg was two and one-half inches shorter than the right; that there was evidence of an old fracture on both bones (tibia and fibula) of the left leg and also an operation scar there; that pus was discharging from this area; that in the area of the pus discharge the bone was very thick; that the left leg, "instead of being in a straight position, is bowed (below the knee) inward, in the opposite direction from an ordinary bow-legged condition; that the discharging of the pus was called osteomyelitis, "or an infection of the bone in the middle cavity;" that the left leg, foot and ankle were "thick and swollen, red and inflamed;" that the operation of the left knee at that time was "almost nil;" that there was "much bowing" outward at the fracture in the femur; that there was an operation scar on the thigh "about ten inches long;" that the coccyx had been broken and "definitely angulated forward;" that there was tenderness on pressure over the back, at the waist line, and over both sacroiliac joints. Dr. Penrod further testified that he saw plaintiff several times; saw him May 31, 1935 (trial June 3, 1935); that at that time plaintiff used a cane and walked with a marked limp; that he "wears a steel brace which I had ordered for him," which brace "is fitted so that there is a large, broad, padded leather belt about six or eight inches wide that straps about his waist line, and from that is built on a steel rod that goes down behind the knee, with the joint at the knee, and a steel rod on each side of the knee down over the ankle, and screwed tightly to the shoe;" that there was an old healed fracture on both bones

about midway between the ankle and knee; that there was "much bony thickening" at this point; that the whole area about the fracture was "calloused and red and inflamed;" that pus was still discharging in this area from "several small holes or sinuses running down into the depth of the tissues, into the bony structure;" that when "he takes his brace off and sits on a chair and then sticks his left leg out in an extended position, there is a tremor that develops within the muscles. What little weight he is able to bear on his left foot, he bears it on the inside of the foot, with the toes turned in." Dr. Penrod further stated that tenderness on pressure was about the same as on his first examination. "Q. Doctor, to what extent is that leg, has the function of that leg been destroyed, in your judgment or opinion? A. Well, he is able to use it, only partly to walk upon, with the aid of the brace and a cane. Without that he could not walk upon this leg. The tissues are wasted. He has a loss of muscle; the muscle fibers are disappearing. There is a loss of nerve force. There is a loss of circulation. There is an inflammatory process between the knee and the ankle, in the fracture, and for practical purposes I would say that his leg is totally disabled for ordinary usage. He is unable to walk upon it without the aid of support. So that, as a leg, it is a useless leg."

Dr. Joseph C. Peden, plaintiff's witness, testified as to X-ray pictures, and his evidence corroborates Dr. Penrod as to fractures, bows, etc. These two were the only physicians who testified. Plaintiff testified as to his injuries and pain and suffering, which had practically never ceased.

That plaintiff has permanently lost the use of his left leg will be conceded, besides he has suffered much pain, and was still suffering some six years after his injury. As we have often stated, the subject of excessive verdict is always difficult of just solution. The oft repeated rule is that appellate courts should not disturb a verdict for damages on the theory that it is excessive, unless it is apparent from the record that the verdict is grossly excessive. [Plater v. Kansas City, 334 Mo. 842, 68 S. W. (2d) 800.] Precedents are helpful only by comparison. However, "when the facts as to the injuries inflicted and losses sustained are similar, though never identical, there should be reasonable uniformity as to the amount of verdicts and judgments in the various cases. Precedents are not altogether valueless even on the amount of verdicts which we have allowed to stand or caused to be reduced, but should be consulted whenever this question is presented." [O'Brien v. Rindskopf, 334 Mo. 1233, 70 S. W. (2d) 1085, l. c. 1093.]

We think that in order to maintain, as nearly as possible, reasonable uniformity, we should rule that the verdict is excessive in the sum of $15,000. [Capstick v. T. M. Sayman Products Co., 327 Mo. 1, 34 S. W. (2d) 480; Margulis v. National Enameling & Stamping

536

Co., 324 Mo. 420, 23 S. W. (2d) 1049.] Therefore, if plaintiff will, within ten days from the filing of this opinion, file here a *remittitur* of $15,000, the judgment for $20,000 will be affirmed, otherwise the judgment will be reversed and the cause remanded. It is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.,* not voting because not a member of the court when cause was submitted.