GEORGE MONTGOMERY v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—73 S. W. (2d) 236.

Division One, June 12, 1934.*

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

---

*NOTE: Opinion filed at September Term, 1933, April 19, 1934; motion for rehearing filed; motion overruled at May Term, June 12, 1934.

*F. A. Foster, Strubinger & Strubinger* and *Allen, Moser & Marsalek* for respondent.

350

HYDE, C.—This is an action for damages for personal injuries under the Federal Employers' Liability Act (U. S. C. A., Title 45,

Sections 51-59). Plaintiff had a verdict for $20,000. Upon motion for new trial the trial court ordered a *remittitur* for $7,500, which was made, and a new judgment entered for $12,500. Defendant has appealed from that judgment.

Plaintiff was a bridge carpenter in the employ of defendant, which operated a railroad in the States of Missouri and Illinois, crossing the Mississippi River between the two States on the Eads bridge. Defendant's bridge department was in charge of Mr. Compton, as foreman. There were assistant foremen under him in charge of various sections of the line. The section upon which plaintiff worked covered more than ten miles of the main line in the State of Missouri from Carrie Street in the city of St. Louis to the Frisco Railway junction in St. Louis County. The bridge department had charge of all the woodwork on bridges, taking care of footings and pilings, and putting in ties on bridges. The bridge men had nothing to do with the maintenance or construction of other parts of the tracks. Mr. Watkins, the assistant foreman in charge of the gang in which plaintiff worked, testified that on the morning of the day plaintiff was injured, he directed plaintiff to operate the motor car on which the gang rode to work; that they were going to repair a broken plank in the Bonhomme Road bridge, an overhead bridge in St. Louis County carrying a county road above the railroad's tracks; that defendant was charged with the maintenance of this bridge; that he found out the evening before about the broken plank in this bridge; that in a telephone conversation with Compton the evening before he reported it to him; and that he told him that he was going out the next morning to repair it.

Plaintiff testified that Watkins "told me to get the motor car running, we were going out as far as Bonhomme Road looking over the bridges and things. . . . That is all he told me at that time." Some of the other men in the gang gave him the information that they were going out to repair the Bonhomme bridge that morning. There were seven men in the gang who rode on the motor car and they also had on it "lug hooks, crow bars, cross cut saws and ropes and all our carpenter tools . . . water bag, hand tools that we always carry with us." They started out from Easton Avenue (about six miles from Bonhomme Road), after getting orders permitting them to go over the line, from the telegraph operator. Plaintiff operated the car. He testified that as they crossed Ferguson Avenue he slowed down the motor car but did not stop and as they went by looked over a slide where a fence had been built to keep the sliding earth off of the tracks. He ran the motor car on to the Rock Island junction, where they stopped and hung out their order staff, "a rod with a number on it that the dispatcher gives." The motor car went around the Y there, stopping twice to throw switches. Plaintiff said that

they also picked up three old ties "in between the two tracks there at the Y and loaded them on the motor car." He said the foreman "ordered us to pick those ties up and put them on the motor car." Plaintiff said he had no idea "what they were going to use those old ties for." Near the Y was the river Des Peres bridge, carrying the railroad tracks over the river. Plaintiff said that he slowed down and looked at it but did not stop. He said "I looked at it; I don't know whether the rest looked at it or not." Near the Des Peres bridge. the railroad went under Walton Road bridge, an overhead bridge carrying a county road over the railroad. He said they looked over Walton bridge and the telltale, which is a "kind of a screen or netting with a strap hung down" for the purpose of warning a man on top of a freight car that he is approaching a bridge. While traveling between the Woodson Road bridge and the Olive Street Road bridge plaintiff was injured. Both of these were bridges over which the railroad tracks ran.

Plaintiff testified concerning the matter of their duties with respect to bridges while going over the line, as follows:

"It was my duty to inspect as we went over the line, over any bridges. . . . We always stop and look at all bridges when we went along the railroad. . . . Q. And you were going up to the Bonhomme bridge? A. The Bonhomme bridge; that was the orders I got. Q. Did you know what you were going to do there? A. No, sir; the boss didn't tell me. Q. He didn't tell you he was going to repair that bridge, did he? A. He didn't tell me; he said we were going out over the line as far as Bonhomme bridge. . . . Q. You say there, 'we were going to repair the bridge,' the way I understand it. A. Some of the men told me that, but all the orders I got was we were going over the line to Bonhomme bridge. . . . Q. *Did you get any other orders that morning except to go out to Bonhomme bridge* to repair it? A. *To run the motor car.* Q. Did he give you any other orders? A. *I don't recall him giving me any other orders.* Q. Did he say anything else to you except to tell you to run the motor car and that you were going out as far as Bonhomme bridge? A. Yes; that was the orders he give me. . . . Q. Who was it that told you to inspect as you went on out? A. That was our standing orders. Q. Well, who told you? A. The boss. Q. Who? A. Mr. Compton told me, and Mr. Watkins. Q. They told you to inspect when they sent you out on inspection trips, didn't they? A. Yes, sir; we took general inspections at certain times. Q. And this wasn't an inspection trip, was it? A. *If we saw anything we were to look out for inspections.* Q. Who told you to say that? A. No one. We had orders to that effect. Q. *Who gave you those orders?* You say Mr. Compton and Mr. Watkins? A. Yes, sir. Q. *When did they give them to you?* A. *When I went to work for*

*them.* . . . Q. And you know as a matter of fact, that you weren't inspecting, except when you were sent out on inspection trips? A. Why, sure *we was to look out for bridges at all times?* Q. How fast were you going immediately prior to this jerk? A. Well, we would run from five to ten, to fifteen miles an hour at places. Q. And do you say you can inspect those bridges going that fast? A. I didn't say that. We generally slowed down for bridges if we hadn't been over the line for a few days. Q. They had track walkers, didn't they? A. Yes, sir; I expect they did. Q. They walk up and down the line? A. Yes, sir; once a day. Q. And yet when you were going out on these trips, you were expected to look out for these bridges? A. Yes, sir; the track walkers might be out and inspect, and two or three hours later we would come along and find something. Q. Did you ever pick up anything yourself? A. We picked up a brake beam. Q. Is that the only occasion? A. That is the only occasion I recollect. . . . Q. Who located the repair work that was needed on these bridges? A. We located a lot of it ourselves. Q. And you located it by making inspections, did you? A. Yes, sir. . . . Q. Is there any other equipment along there that is in your jurisdiction? A. The water tank. . . . Q. Now, after you had gotten to the water tank and Olive Street Road bridge that day, what did you have to do? A. We would have looked over the bridges and the water tank, we would have inspected the bridges and looked after that to see if there was anything the matter. . . . Q. You didn't get any orders that morning to do that? A. No, he didn't give us any particular orders that morning about the water tank.'' (Italics ours.)

The evidence of defendant's bridge department foreman, Compton, showed also that the bridge department had charge of water barrels at bridges, which the track department kept filled with water for use in case of fire. He said, however, that the bridge men had no orders to watch them every time they went over a bridge; that a man sitting on a motor car "can't see whether there is water in them or not," but that it was the duty of the bridge men and every class of railroad men to look out for the prevention of fire. Watkins, the assistant foreman under whom plaintiff was working, testified that bridge inspections could not be made while riding along; that to inspect a bridge it was necessary to stop and go underneath it; that he made the inspections himself; that he "never authorized one of the men to make inspections;" but that it was the duty of every man working for the railroad to see that the right of way was clear; and that the duty of all the men was "if he seen anything he was supposed to report them.''

A deposition was offered in which Watkins testified:

"But every time you go near that bridge you look at it? A. Can't

help it. Q. Is that one of the standing orders of the company? A. Yes, sir. . . . Q. And when you pass over the line— A. Understand, we don't call that inspecting. Q. Looking at it? A. Passing over a bridge or anything like that, we don't call that inspecting; that is, we just look at it, and if we don't see something needing it, we stop and do it.''

Watkins also testified at the trial as follows:

''Q. When you say out on the line—when you were out on the line and find anything that needs repairing, you stop right there and fix it on the bridge, don't you? A. Oh, no, not right immediately. Q. Something that needs attention, you fix it right there? A. If we have material with us we might. Q. If you don't have material with you, you get it quickly, don't you? A. Well, we look after it afterwards. Q. But you keep looking after these bridges and structures to keep them in repair? A. I stop and inspect them once in a while. . . . When we go over the bridge we are not inspecting. If we see anything that don't look right, we look at it. Q. But do you look if you are going along? A. No, not if we are going along; we ain't looking for nothing, we are just going to the place we started. Q. And if you are out inspecting, then you are looking for it? A. Yes, sir. Q. How often do you make inspection trips for these bridges? A. About twice a month; sometimes every other week, depends upon the weather.''

There is an accurate account in plaintiff's brief of what plaintiff was doing when the accident, which caused his injuries, occurred, to-wit:

''Plaintiff was seated on the side of the top deck, with his feet resting on the lower deck. His back was in the general direction in which the car was running, although he stated that in operating the car the operator would have to sit kind of sideways toward the front end on one side. In operating the car he would be near the place where the revolving disc and drive wheel were located, between the two decks. He stated he would be near these parts and would have to reach over and past them in moving the operating levers. (The negligence charged was failure to guard the opening between the two decks and defective condition of the revolving disc causing it to slip and then grab and jerk the car.) Plaintiff testified that the car ran properly until just before his injury. He stated that they were going south along the line, toward Olive Street road. . . . Plaintiff testified that in pulling up that grade the motor wasn't pulling like it ought to, and it seemed to be slowing down considerably. He looked down a time or two to see what the trouble was, and Mr. Watkins asked him if he knew what was wrong, and plaintiff answered in the negative. Right at the time he was hurt plaintiff started to look over again and the car gave a sudden jerk and threw

him overboard. At the time he was sitting on the side of the motor car, and had his left hand on the top deck, and he had to bend over. The car gave that jerk and threw his hand into the fabric wheel and revolving disc of the motor. When the car jerked it jerked forward, throwing plaintiff face first, back of the car. At the time the jerk occurred the speed of the car had slowed down to about five miles an hour.''

█ Before considering any questions concerning the negligence of defendant or as to procedural errors, we must determine the question of whether plaintiff at the time of his injury was engaged in interstate work so as to be entitled to sue under the Federal Act. This is true because the question is the fundamental one of jurisdiction. [Milburn v. C., M., St. P. & P. R. Co., 331 Mo. 1171, 56 S. W. (2d) 80, l. c. 86.] If plaintiff was engaged ''at the time of the injury in interstate transportation or work so closely related thereto as to be practically a part of it'' his rights can only be determined under the Federal Act. [New York Central Railroad Co. v. Winfield, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139; New York, New Haven and Hartford Railroad Co. v. Bezue, 284 U. S. 415, 52 Sup. Ct. 205, 76 L. Ed. 370, 77 A. L. R. 1370; Chicago & Eastern Ill. Railroad Co. v. Industrial Commission, 284 U. S. 296, 52 Sup. Ct. 151, 76 L. Ed. 304; C. & N. W. Railroad Co. v. Bolle, 284 U. S. 74, 52 Sup. Ct. 59, 76 L. Ed. 173.] If, however, plaintiff's work at that time cannot be so characterized, then his rights are fixed by our Workmen's Compensation Act. The evidence must prove facts showing that the Federal Act was applicable, and this burden was upon plaintiff. [Shidloski v. N. Y. C. & St. L. Railroad Co., 333 Mo. 1134, 64 S. W. (2d) 259; Jarvis v. C., B. & Q. Railroad Co., 327 Mo. 428, 37 S. W. (2d) 602; Osborne v. Gray, 241 U. S. 16, 36 Sup. Ct. 486, 60 L. Ed. 865.] Two reasons are advanced to support plaintiff's claim that his evidence met the test. First: That the Bonhomme Road bridge, which the men were on their way to repair, was an instrumentality of interstate commerce. Second: That it was plaintiff's duty to observe the condition of the railroad bridges, which were unquestionably such instrumentalities, and that plaintiff was inspecting them for defects as he passed over them that morning.

Plaintiff argues that the purpose of an overhead bridge is ''to facilitate traffic on the railroad and to make it speedier and safer'' by eliminating ''the danger to trains and the delay in their operation due to grade crossings.'' Speaking generally, it is no doubt true that an overhead bridge, and every other instrumentality and structure which serves any useful purpose whatever, as well as all work done for a railroad company, facilitates in some measure the business of and transportation over the railroad. But that is not the test of

whether the Federal Act applies. The United States Supreme Court has in the recent Bolle, Bezue and Industrial Commission cases, above cited, cleared up the whole matter and limited the field covered by the Federal Act by restating the proper test of its application and by overruling several cases in which even that high court had inadvertently lost sight of the true principles. These cases and the cases they overruled are fully reviewed and discussed and the controlling principles applicable here are stated in the opinion of this court in Allen v. St. Louis-San Francisco Ry. Co., 331 Mo. 461, 53 S. W. (2d) 884. There, Allen, a carpenter, was killed while engaged in cleaning out a sewer running from the railroad's terminal yards, and serving the roundhouse, shops and other buildings, where work was done on both interstate and intrastate engines and cars, and the power house which furnished steam for them. It was there argued that the sewer was an instrumentality of interstate commerce because " 'the cleaning out of the sewer so as to maintain same in proper operative condition,' and that the work he was doing 'had the effect of facilitating or aiding interstate commerce' and therefore a cause of action arises under the Federal Act.'' This court said:

"Allen was not engaged in repairing or putting in usable condition any instrumentality or facility then in use or immediately about to be used in interstate transportation. He was enlarging the hole in the top of the sewer main to expedite the cleaning out of the sewer. The relation, if any, of the sewer to interstate transportation was extremely remote for certainly the sewer cannot be classified as an instrumentality actually used in interstate transportation or as having any direct connection therewith.''

Although the question has not often been raised, when it has been, even prior to the recent restatement of the test above discussed, the courts have held that the connection of an overhead bridge or other highway crossing with interstate transportation is too remote for work thereon to be classified as work so closely related to interstate transportation as to be practically a part of it. [Hallstein v. Penn. Ry. Co., 30 Fed. (2d) 594; I., G., N. Railroad Co. v. Sifuentes (Tex.), 6 S. W. (2d) 192; see, also, Boles v. Hines (Mo. App.), 226 S. W. 272 (where it is held that repairing a depot is not such work).] It would seem, especially in view of the later cases, that this view is correct, and that the test of whether an instrumentality is one of interstate commerce, so that repairing it would be work so closely related to interstate transportation as to be practically a part of it, therefore, is not merely whether such instrumentality to some degree facilitates interstate transportation, but is whether it is an instrumentality reasonably essential to carrying on interstate transportation in the operation of a railroad and actually in direct use for that purpose.

■ Plaintiff here also argues, as did plaintiff in the Hallstein case, that if the bridge had not been repaired, boards might "get loose and drop down on the track and interfere with the running of trains." As there said, "such argument entirely ignores the fact that at the time of the accident no necessity for work upon or the removal of wreckage from the tracks had arisen;" and that then "the bridge was what it had always been, solely a part of the street and highway system, . . . entirely separated from all direct participation in or relation to the transportation moving beneath it." If and when any part of the bridge falls upon the tracks and is being removed therefrom by railway employees, we will have an entirely different question. We therefore cannot agree with plaintiff's first contention.

Neither can we sustain plaintiff's second proposition that his activities were such as to bring him within the protection of the Federal Act because he was looking out for defects in bridges which were interstate instrumentalities. The leading case upon the question of track work is Pedersen v. Delaware, Lackawanna & Western Railroad Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125. In that case plaintiff, an employee of a bridge repair gang, was injured while carrying bolts for use in repairing a bridge, over which ran tracks used by interstate trains. The United States Supreme Court held that the work which plaintiff was doing when he was injured was so closely related to interstate transportation as to be practically a part of it because "it was necessary to the repair of the bridge that the materials be at hand and the act of taking them there was a part of that work," and because, therefore, "it was a minor task which was essentially a part of the larger one." Prior to the Pedersen case there was some doubt even as to whether the repair work itself, on tracks and bridges over which interstate trains passed, was work so closely related to interstate transportation as to be practically a part of it. [18 R. C. L. 855, sec. 315.] It is said that the Pedersen case "stands as a landmark in the extension of federal control and the elimination of state authority over railroad employees;" that it "in effect transferred thousands of railroad employees from the control of state laws to the domain of the rights and liabilities created by the national statute;" and that through it "all laborers in the United States repairing or working upon highways of interstate commerce by rail, including bridges, switches, trestles, tracks and roadbeds became immune from the dominion of state laws insofar as their rights for injuries were concerned." [2 Roberts' Federal Liability of Carriers, 1488, sec. 775.] It is in harmony with the Pedersen case to hold that an employee, making a trip for the purpose of policing or inspecting tracks and bridges used by interstate trains for the purpose of insuring their maintenance in operative condition, or super-

vising work for that purpose, is engaged in work so closely related to interstate transportation as to be practically a part of it. [C. & O. Ry. Co. v. Nixon, 271 U. S. 218, 46 Sup. Ct. 495, 70 L. Ed. 914; Louisiana R. & N. Co. v. Williams, 272 Fed. 439; Sells v. A., T. & S. F. Railroad Co., 266 Mo. 155, 181 S. W. 106; 2 Roberts' Federal Liability of Carriers, 1485, sec. 774.]

However, even the Pedersen case goes no further than to include, under the protection of the Federal Act, work which is necessarily incidental to a task so closely related to interstate transportation as to be practically a part of it. "It is the employment that determines whether or not the injury to the employee is within the purview of the act and not necessarily the particular act of the employee at the precise time of the injury. . . . The particular act which attends the injury is significant only as it shows or tends to show the nature of the work with respect to interstate commerce. It may or may not be sufficient, of itself, to show that nature." [2 Roberts' Federal Liability of Carriers, 1373, sec. 727.] For example, an employee may be eating his lunch and yet be held engaged in interstate transportation. [Milburn v. C., M., St. P. & P. Railroad Co., 331 Mo. 1171, 56 S. W. (2d) 80, l. c. 85, and cases cited.] He may be cutting weeds, on an interstate railroad's right of way, for one purpose and be so engaged, and he may be cutting weeds at the same place for a different purpose and not be so engaged. [Plass v. C., N. E. Railroad Co. (N. Y.), 117 N. E. 952, 123 N. E. 852.] Likewise, he may be furnishing steam, coal, sand or water for use in interstate cars or engines and not be engaged in work so closely related to interstate transportation as to be a part of it. [C. & N. W. Railroad Co. v. Bolle, supra; C. & E. I. Railroad Co. v. Industrial Commission, supra.] Each case must necessarily be determined upon its own facts. "Things do not have to be in broad contrast to have different practical and legal consequences. Actions take estimation from degrees and of this law and life are replete with examples." [Industrial Accident Commission v. Davis, 259 U. S. 182, 42 Sup. Ct. 489, 66 L. Ed. 888.]

The mission, upon which plaintiff's gang started that morning, was certainly not primarily to make inspections. It is clear, from plaintiff's own evidence, that their sole mission was to repair the highway bridge, which we have held was not work so closely related to interstate transportation as to be practically a part of it. There is not a scintilla of evidence that they had any other object in view when they started there or that any orders were then or thereafter given to do anything else. Plaintiff, from the time he got out the motor car until he was injured, was engaged in transporting the men and their tools from their starting point to the place of that work, namely, from one part of the State of Missouri to another. The ac-

count of how plaintiff was injured, the position he occupied, the machinery it was necessary for him to give his attention to in operating the car, all goes to show that any lookout he would keep for defects in bridges, as he operated the car over them, would necessarily be casual and no more than would be expected of any railroad man passing over the track on a car or train.

Plaintiff ran the car over all of these bridges without even coming to a stop. He was, as well as were all of the other men, under the direction of a foreman who was in charge of the trip and who would determine when and where any stop would be made, and would decide whether to do anything different from what they started out to do. It is clear that neither the foreman nor the men with him were engaged upon a trip to inspect bridges for the purpose of insuring their maintenance in operative condition for interstate trains. To do so would surely require more detailed observation than anyone could make riding over them at five miles per hour, especially while operating the car. They were, no doubt, keeping a lookout for anything which might impede the progress of their motor car and if one of them had noticed any obviously bad condition of anything he, of course, should have reported it to the foreman. That was a duty arising from the relation of a railroad employee to his company incidental to any railroad work. Nevertheless, it seems apparent, under the rules laid down for determining when work is so closely related to interstate transportation as to be practically a part of it, that the fact that plaintiff and the men with him might have kept their eyes open for obvious defects would not make their trip for a primary purpose not connected with interstate transportation, work which would bring them under the protection of the Federal Act. That is the view of such cases as have considered the question. It has been held that casual observation or running inspection and notice of conditions of the track over which a railroad employee is riding for another specific purpose or of passing trains thereon, is not work so closely related to interstate transportation as to make the Federal Act applicable to his case. [Middleton v. Southern Pac. Railroad Co., 61 Fed. (2d) 929, 54 Fed. (2d) 833; Mo. Pac. Railroad Co. v. Industrial Commission (Ill.), 180 N. E. 912; Gulf, Mobile & Northern Railroad Co. v. Myer (Miss.), 110 So. 444.] It is said: "It is the duty of every railroad employee, independent of any rule, to report any defect he may observe in roadbed or equipment which might delay or hinder transportation or result in injury. Such an incidental duty is not a real or substantial part of interstate transportation nor was the work so closely related to it as to be a part of it, otherwise practically every employee in the operating department of a railroad company would be considered in interstate transportation at all times when he is on duty." [Industrial Commission

case, supra.] Likewise, to hold that merely "keeping his eye out for anything" was work in interstate transportation "would be to hold that all the employees of a railroad company, while on or about the company's premises, could, by a stretch of the imagination, be held to be engaged in that which furthers the business of interstate commerce." [Myer case, supra.] It therefore follows that plaintiff's only remedy was to file his claim with the Missouri Workmen's Compensation Commission.

The judgment is reversed. *Ferguson* and *Sturgis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.*, absent.