G. H. ROGERS, Administrator of the Estate of JOHN F. ROGERS, v. MOBILE & OHIO RAILROAD COMPANY, a Corporation, Appellant.— 85 S. W. (2d) 581.

Division One, July 9, 1935.

*Cottrell Fox* and *Carl Fox* for appellant; *Roberts P. Elam* and *Rufus Creekmore* of counsel.

*R. J. Horsefield* and *C. O. Inman* for respondent.

HYDE, C.—This is an action, under the Federal Employers' Liability Act (U. S. C. A., Title 45, 51-59), for damages for personal injuries. This suit was brought by John F. Rogers, who was run over by appellant's cars, while he was in its employ as a brakeman. Rogers had a verdict for $22,500, and appellant has appealed from the judgment against it entered thereon. John F. Rogers died and, prior to hearing in this court, the cause was revived in the name of his administrator.

The serious question in this case is whether Rogers was, at the time of his injury, engaged in interstate transportation or in work so closely related to such transportation as to be practically a part of it, which is the test of the applicability of the Federal Act. [Chicago & N. W. Railroad Co. v. Bolle, 284 U. S. 74, 52 Sup. Ct. 59, 76 L. Ed. 173; Chicago & E. I. Railroad Co. v. Industrial Comm., 284 U. S. 296, 52 Sup. Ct. 151, 76 L. Ed. 304; New York, N. H. & H. Railroad Co. v. Bezue, 284 U. S. 415, 52 Sup. Ct. 205, 76 L. Ed. 370, 77 A. L. R. 1370.] This question is raised by appellant's assignment of error that the court erred in overruling its demurrer to the evidence at the close of the case. The facts in this case from which this question must be determined are undisputed.

Rogers had been employed by appellant as a brakeman on freight trains for twenty-three years, prior to his injury on April 21, 1930. On that day he was head brakeman on freight train No. 31 which left Jackson, Tennessee, for Okolona, Mississippi. In this train were several cars of interstate freight. There were also eight gondola cars which had been loaded with gravel at Johnsonville, Tennessee, delivered to appellant at Jackson, and placed in its train there. These gravel cars were billed to Selmer, Tennessee, but, either because there was not room for them there or because of a request from the consignee, the train crew got orders to set them out at Bethel Springs, Tennessee, a nearby station. The movement of these cars was entirely intrastate as they were at no time to be moved out of the State of Tennessee.

When the train reached Bethel Springs, it had orders to go on the passing track to allow freight train No. 28 to pass it and also to set out these gravel cars, and upon arriving there, the train pulled upon the passing track, which was west of the main line track. West of the passing track was a house track upon which the travel cars were to be left. There was a planing mill with a loading platform in front on the west side of the house track and there was a box car on the house track by this loading platform, having been placed there to be loaded with lumber. The train was headed south so that it was necessary to switch the house track from the south end. There was not enough room on the house track, south of the box car, to leave the gravel cars there, so the first movement was to take out the box car and couple it to the south gravel car. To

make this movement Rogers, who as head brakeman was in charge of the switching, went over to the house track and removed the derail south of the box car. He then came back and uncoupled the engine and rode it south, to the house track switch stand. He threw the switch, gave a back-up signal and, when the engineer moved back on the house track, he got on the engine, rode back to the box car and coupled it to the tender. The box car was then pulled out onto the passing track, Rogers again threw the switch, gave the back-up signal, and the engine backed north with the box car to the standing train, where Rogers coupled the box car to the south gravel car. The conductor of the train uncoupled the north gravel car, gave the go-ahead signal which Rogers relayed to the engineer, and the engine moved again south past the switch stand with all nine cars. Rogers threw the switch again for the next movement, which was to back onto the house track until the box car was opposite the loading platform, at the place where it had been, but with the gravel cars north of it. It was then intended to uncouple the engine so that it could go back to the rest of the train and proceed on its interstate journey.

The engine was not to be moved back onto the house track with these cars until Rogers gave a back-up signal. Just after Rogers had lined up the switch, train No. 28 passed on the main line and Rogers says that he waved to the fireman on that train. The engineer and conductor of his own train and appellant's other witnesses said that he gave a back-up signal. Whether he did or not, this was apparently the interpretation placed by the engineer on whatever movement of his hand Rogers did make at that time. Rogers walked north toward the loading platform, which was about 179 feet from the switch stand. He walked with his back to the train, which followed and overtook him, moving upon what the engineer interpreted to be a back-up signal, and he was struck by the corner of the box car near the derail, about 16 feet south of the loading platform.

Rogers' testimony as to what he was doing and intended to do was as follows:

"After I had lined this switch for the house track, I gave no back-up signal. It was my duty to give that back-up signal, and I intended to give that signal when I got myself placed up in this little pathway that led south of the platform. That little pathway was somewhere around 10 feet south of the platform. . . . I started up to the little pathway just south of the platform, figuring on stationing myself there on this pathway to give the signal to back-up, so I could be there to spot this car at the platform where I got it from. It was my duty to give the signal to spot the box car at the platform. That is, I would give the signal to stop, signal the engineer to stop, when the box car got back to the platform

where it had formerly been. It was necessary for me to be at the south end of the platform to give the stop signal at the proper time. . . . If I had not been struck, the next moves I would have made, I would have been in this little pathway, then I was figuring on giving my signal to back-up, then the cars would have backed up, then I would have given the stop signal to stop them after the car was spotted. . . . Then I would cut my engine off and go back to my train. I had to line that derail back before I left there. The purpose of lining that derail back was to keep the cars from running out on the main line.''

Appellant argues:

''When the train stopped on the passing track at Bethel Springs and the engine was uncoupled from the train to commence the series of switching movements, necessary to set out the intrastate gravel cars on the house track, interstate transportation ceased, and the interstate cars in the train and the interstate freight in those cars remained at rest; and the work of the crew, thereafter in switching the intrastate cars was solely for the purpose and had the sole result of intrastate transportation.''

This is too narrow a view of the work Rogers was doing, and fails to take into account the well-settled principles that, while '' 'the true test (of the applicability of the Federal Act) is the nature of the work being done at the time of the injury' . . . 'it is the employment that determines whether or not the injury to the employee is within the purview of the act, and not necessarily the particular act of the employee at the precise time of the injury.' . . . The particular act which attends the injury is significant only as it shows or tends to show the 'nature of the work' with respect to interstate commerce. It may or may not be sufficient, of itself, to show that nature.'' [2 Roberts' Federal Liability of Carriers, 1373, sec. 727.] ''The service being rendered by an employee at the time of his injury may have a double aspect towards commerce. It may . . . clearly be service in interstate commerce, yet at the same time being in furtherance of local commerce or of purposes not directly related to commerce of any sort. Yet, in such a case, participation in interstate commerce being shown, it is of no consequence, in determining the applicability of the liability statute, that he was also serving otherwise than in such commerce.'' [2 Roberts' Federal Liability of Carriers, 1375, sec. 728; see, also, New York Central & H. Railroad Co. v. Carr, 238 U. S. 260, 35 Sup. Ct. 780, 59 L. Ed. 1298; Pedersen v. D., L. & W. Railroad Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125; Erie Railroad Co. v. Winfield, 244 U. S. 170, 37 Sup. Ct. 556, 61 L. Ed. 1057; Montgomery v. Terminal Railroad Assn., 335 Mo. 348, 73 S. W. (2d) 236; Milburn v. C., M., St. P. & P. Co., 331 Mo. 1171, 56 S. W. (2d) 80.]

Is it not apparent, in the light of these principles, that Rogers' employment was interstate transportation? His mission and that of his crew was to take an interstate freight train with cars of interstate freight from Jackson, Tennessee, to Okolona, Mississippi. The train when it started was an interstate train, moving for the purpose of transporting goods in interstate commerce and it never ceased to be primarily moving for that purpose until it arrived at its destination. It did not lose its interstate character because, along with moving interstate cars it also for convenience moved cars from one point in the State of Tennessee to another point therein. The movement of such cars was merely incidental to the main movement, which was interstate transportation. Rogers was acting as head brakeman for the purpose of assisting in this movement in interstate transportation. When the train arrived at Bethel Springs, it was stopped in compliance with orders to deliver eight cars of intrastate freight. That act, of course, was in furtherance of local commerce, but it was also in assistance of the interstate movement because it was necessary, in the orderly conduct of appellant's business, to get these cars out of the train at that point in accordance with its instructions before the movement of this interstate train with its interstate freight could proceed again. What difference is there, in principle, between this case and a case where it is necessary to move intrastate cars in order to get to interstate cars which it is intended to move? In Pennsylvania Co. v. Donat, 239 U. S. 50, 36 Sup. Ct. 4, 60 L. Ed. 130, the court said that the contention that moving intrastate cars, under those circumstances, was not an interstate movement was "so frivolous as not to need further argument" than to state the facts.

Appellant says that interstate transportation was delayed by taking the gravel cars out of the train and that it would have been facilitated if instead all cars had been taken on to the end of the run. No doubt interstate runs could always be made quicker if no local freight was handled but even so, handling local freight does not change the interstate character of the run. Beside the fact that the train might have been slowed down in covering the remaining sixty-seven miles, unnecessarily hauling these heavy cars, appellant would have to bring them back from Okolona, Mississippi, on another interstate train in order to carry out its contract with respect to them. Therefore, we can hardly agree, on this theory of appellant, that interstate transportation was not facilitated by taking these cars out of the train when they reached their destination. Switching out an intrastate car from an interstate train seems, in principle, the same as unloading an article of intrastate freight from a car filled with interstate freight. Surely if a train loaded with interstate freight stopped to set out one intrastate package from one car that would not change the employment of the brakeman to

intrastate transportation while he was handing it out. [See authorities hereinafter cited for such cases.]

The view that Rogers' employment was within the Federal Act is supported not only by reason but by authority. Appellant relies upon cases like Illinois Central Railroad Co. v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. Ed. 1051, where a fireman of a "switch engine operated exclusively within the City of New Orleans" was killed in a collision. "The general work of the crew consisted in moving cars from one point to another within the city." Sometimes these cars were interstate cars and sometimes they were intrastate. The court stated the basis of holding the Federal Act inapplicable to the movement in which the fireman was killed, as follows: .

"At the time of the fatal injury the intestate was engaged in moving several cars, all loaded with intrastate freight, from one part of the city to another. That was not a service in interstate commerce, and so the injury and resulting death were not within the statute. That he was expected, upon the completion of that task, to engage in another which would have been a part of interstate commerce is immaterial under the statute, for by its terms the true test is the nature of the work being done at the time of the injury."

Such cases are not in point because "trains moving between terminals within the same state. . . . have no interstate status per se." [2 Roberts' Federal Liability of Carriers, 1414, sec. 742.] During the same day local yard employees often and rapidly pass from one class of employment to another. [Illinois Central Railroad Co. v. Behrens, supra; New York Central & H. Railroad Co. v. Carr, supra; Milburn v. C., M., St. P. & P. Railroad Co., supra; Erie Railroad Co. v. Welsh, 242 U. S. 303, 37 Sup. Ct. 116, 61 L. Ed. 319; Howard v. M. & O. Railroad Co., 335 Mo. 295, 73 S. W. (2d) 272.] The kind of commerce in which such employees are engaged is, of course, to be determined by the purpose of each particular movement, because there is no relation of one movement to another and they constitute "a succession of separate tasks," instead of being "a series of acts" which are part of "a single and indivisible task" (see Erie Railroad Co. v. Welsh, supra); and such a separate movement is not "a minor task which was essentially a part of a larger one" which was an interstate task. [See Pedersen v. D., L. & W. Railroad Co., supra.]

"But when a train is sent out on a run from a point in one state to a point in another state, employees who take part in the actual running of such trains, such as engineers, firemen, conductors, brakemen, flagmen, baggagemen, and the like, are employed in interstate commerce within the meaning of the act. Their status takes character from the fact that the run of the train is interstate, and hence is not affected by changes in the character of traffic handled en route, or by.

the nature of the employee's actual work, so long as such service is in the course of his employment as trainman thereon. . . .

"Employees operating trains between terminals in different states, and those operating intrastate trains which carry interstate traffic, are engaging in interstate transportation, not only while they are making the run between their terminals, but also while they are performing acts incidental to such work en route. Thus, where a train on an intrastate run, but carrying some cars containing interstate traffic, came to a point on its trip where it was necessary to set out from the train two intrastate cars, a brakeman on that train who was injured after these cars had been detached from the train and while they were being pushed upon a sidetrack by the engine, as the result of an inadvertent application of the air brakes while he was on top of one of such cars attempting to set the hand brake, was injured while employed in interstate commerce. This operation, it was pointed out, was an incident of the movement of the interstate train, and necessary to be performed before the train could proceed on its way. For like reasons trainmen on such trains are furthering interstate transportation and hence subject to the Federal Employers' Liability Act while picking up, at stations en route, cars to be included in the train and carried forward, regardless of whether such cars are themselves interstate or local in character. So, also, such employees continue to be employed in interstate transportation while loading or unloading shipments at stations between terminals, even if the shipments are in intrastate commerce." [2 Roberts' Federal Liabilities of Carriers, 1411, 1417-19, sec. 742.]

The case, referred to above is New York Central & Hudson River Railroad Company v. Carr, supra. A brakeman on an interstate train was injured while setting out two intrastate cars from the train. "It was the duty of one brakeman (O'Brien), to uncouple the air hose from the engine, and for the other (Carr) to set the handbrakes in order to prevent the two cars from rolling down upon the main track. O'Brien, having failed to open the gauge to the stop-cock, suddenly and negligently 'broke' the air hose," which caused plaintiff to be thrown off the car and injured. The United States Supreme Court distinguished the case from Behrens v. I. C. Railroad Co., supra, and said:

"Many arguments have been advanced by the railway company to support its contention that, as these two cars had been cut out of the interstate train and put upon a siding, it could not be said that one working thereon was employed in interstate commerce. But the matter is not to be decided by considering the physical position of the employee at the moment of injury. . . .

"The plaintiff was a brakeman on an interstate train. As such, it was a part of his duty to assist in the switching, backing, and uncoupling of the two cars so that they might be left on a siding

in order that the interstate train might proceed on its journey. In performing this duty it was necessary to set the brake of the car still attached to the interstate engine, so that, when uncoupled, the latter might return to the interstate train and proceed with it, with Carr and the other interstate employees, on its interstate journey.''

In Youngstown & O. Railroad Co. v. Halverstodt, 12 Fed. (2d) 995, the Circuit Court of Appeals, Sixth Circuit, following the Carr case, held that a brakeman of a freight train, hauling interstate cars, was within the Federal Act, when working under the following circumstances. On the way to its destination at East Liverpool ''some 15 or 18 empty cars were to be placed at the Saeger mine. There was room for only 8 to 10 cars in the siding of that company, and it was necessary temporarily to place the others on the long siding. The crew then proceeded to East Liverpool, where, after their work was done, the train was reconstituted and started on its return trip. It (again) carried shipments consigned to points outside the state. On arriving at West Point, the cars that were in the train were placed in the team siding and the two engines pulling them proceeded to the Saeger switch and removed some loaded cars therefrom to the main track. They then went to the long siding and coupled to the empty cars that had been left there in the morning, to be placed on the Saeger switch. While pulling the empty cars out of the siding the engine was moving 4 or 5 miles an hour. It was Halverstodt's duty to set the brakes on the cars. After setting the brakes on the second car, he discovered that, because of a defective passage, it would be necessary to alight from the car and get on the next one from the ground.'' In getting down for this purpose Halverstodt was injured. The court said the Behrens case was ''clearly inapplicable to a member of a crew of an interstate train, who, in handling it, cuts out of the train some intrastate cars, and in so doing is injured.'' The court further said:

''The question here, however, is complicated by the fact that the interstate shipments were temporarily on the 'team track,' and at the time plaintiff was injured he was engaged in a local switching movement. . . . It was a part of the duty of the crew of which plaintiff was a member to switch cars from the interstate train into the Saeger siding. It was not possible to place the cars that were being moved at the time of the injury into that track on the trip south. So they were placed on the long siding, and on the return trip, when plaintiff was again engaged in interstate commerce, it became his duty to do that which he was unable to do on the trip south—place the cars in the Saeger siding. This service was a part of the handling of the interstate train, and in our opinion the performance of it was interstate commerce.''

In McDonald v. P. & L. E. Railroad Co. (Pa.), 123 Atl. 591, certiorari denied 264 U. S. 588, 44 Sup. Ct. 402, 68 L. Ed. 863, plaintiff, a freight conductor, was in charge of a train which left Youngstown, Ohio, for Dickerson Run, Pennsylvania, carrying interstate freight. The court said:

"The train proceeded as far as Woodlawn, Pa., where the loaded (interstate) cars were delivered, leaving only the engine and caboose. Orders were received at that station to attach to a number of empty cars, several to be distributed along the road at various points between Woodlawn and Dickerson Run, and the remainder delivered at the latter station. The train had almost reached Smithton Station, a point within 15 miles of its final destination, when the accident which caused plaintiff's injury occurred. . . .

"The mere fact that local freight cars may have been handled between stations, or that during part of the trip no freight was transported did not change the purpose of the employment, which was to operate a train from a point in one state to a point in another state. . . .

"Under the facts here involved the nature of the employment does not depend upon the destination of a specially designated car, or the fact whether loaded or empty. Plaintiff might, at a particular moment, have been actually engaged in moving freight purely intrastate in character, without affecting his general employment in interstate commerce, which required his train to travel from one state to another, and receive and transport both interstate and intrastate freight, or cars, along the way. . . .

"Plaintiff's employment required him to travel the entire distance between terminal points, and it is immaterial that his orders directed distribution of cars at different stations along the route, or that the destination of the original interstate shipment was reached before the accident occurred, and at the time of the accident the cars making up the train were purely local. It was the course of the train from the beginning of the run to the end that established the character of commerce in which it was at the time engaged."

[Other authorities of similar import are Brum v. Wabash Ry. Co., 335 Mo. 876, 74 S. W. (2d) 566; Midwest Nat. Bank & Trust Co. v. Davis, 288 Mo. 563, 233 S. W. 406; Hudgins v. K. C., M. & O. Railroad Co. (Tex.), 2 S. W. (2d) 958; T. & P. Railroad Co. v. Lester (Tex.), 207 S. W. 555; Keathley v. C. & O. Ry. Co. (W. Va.), 102 S. E. 244; G., M. & N. Railroad Co. v. Walters (Miss), 134 So. 831; Pennsylvania Railroad Co. v. Morrison, 3 Fed. (2d) 986; Daley v. B. & M. Railroad Co., 166 N. Y. Supp. 840; Evans v. U. S. Railroad Administration, 182 N. Y. Supp. 310; Lierness v. L. I. Railroad Co., 216 N. Y. Supp. 656; Thornbro v. K. C., M. & O. Railroad Co. (Kan.), 139 Pac. 410; Sears v. A. C. L. Railroad Co. (N. C.), 86 S. E. 176; Davis v. Dowling, 284 Fed. 670.] A

different conclusion was reached in Von Brimmer v. T. & P. Railroad Co., 190 Fed. 394, decided before the Carr case. A somewhat different situation is presented when an engine of an interstate train is taken temporarily from its work in connection with its train and used for the movement of an intrastate car which was and never became a part of the train. Such cases as McNatt v. Wabash Railroad Co., 335 Mo. 999, 74 S. W. (2d) 625, and Murray v. P., C., C. & St. L. Railroad Co. (Pa.), 107 Atl. 21, are distinguished from the Carr case on that ground. We hold that the court correctly held the Federal Act applicable in this case and, therefore, properly overruled appellant's demurrer to the evidence.

We have stated the facts in considerable detail, because appellant also assigns error in the court's action on instructions. Error, in giving Instruction No. 1 at request of plaintiff and in refusing appellant's requested instruction, is claimed. Instruction No. 1 covered the whole case and authorized a verdict on the assignment of negligence that the engineer moved the cars without a signal from Rogers in violation of practice and custom. The part of the instruction of which appellant complains is as follows:

"And, if you further find and believe from the evidence that before the engine and cars were moved northwardly as aforesaid the *plaintiff had not given the engineer any signal to so move them,* and that at the time and long prior thereto it was the practice and custom of the defendant in moving cars in the manner and under the circumstances aforesaid not to cause the cars to move without a signal from the trainman who lined the switch for said movement and who was in charge of said movement, and that plaintiff knew of and relied on said custom at the time; and, if you further find and believe from the evidence that the act of the engineer in moving the cars northwardly *without a signal from the plaintiff,* if you so find, was negligence as that term is defined in these instructions, and that plaintiff's injuries were directly caused thereby, then your verdict must be in favor of the plaintiff."

Appellant's refused instruction was as follows:

"The Court instructs the jury that if you find from the evidence that plaintiff threw the switch and immediately thereafter waved to the fireman on passing train No. 28, and that such action on the part of the plaintiff at that time and under those circumstances led the engineer to believe that plaintiff was signaling him to back up, then you are instructed that the engineer cannot be charged with any negligence in backing up under such circumstances."

Appellant says that the italicized words, in Instruction No. 1, state the matter so as to submit the issue of whether Rogers intended the movement of his hand to be a back-up signal, rather than whether the engineer believed or was justified in believing that this movement of his hand was a back-up signal, and that its re-

fused instruction properly stated this issue. There was no prejudicial error in refusing appellant's instruction, because it went too far the other way, by submitting what the action on the part of Rogers led the engineer to believe rather than whether the engineer was reasonably justified in believing that this movement of his hand was a back-up signal or whether it was so nearly like a back-up signal that it could reasonably be so interpreted. It also ignored the charge of negligence of backing at an excessive speed. We do not believe that the jury could have been misled as to the issues by plaintiff's instruction. From the evidence, and all the instructions, they could not help but know that they were to find whether Rogers gave a back-up signal or made an entirely different motion of his hand. Appellant would no doubt have been entitled to an instruction stating the issue more specifically but cannot complain when it did not frame and request a proper instruction thereon. Appellant's witnesses testified positively that the signal Rogers gave was a back-up signal, while Rogers testified positively that it was not and demonstrated before the jury what a back-up signal was and what kind of motion he made in waving to the passing fireman. The record before us, of course, does not show this demonstration of the difference between the two, but it does show that there was a difference in the movement of the hand and in the direction in which Rogers would face, under these circumstances. The question, therefore, was: Did Rogers make such a movement of his hand as would be made for a back-up signal, or did he merely wave his hand in the movement of friendly greeting he demonstrated to the jury? Appellant also put the matter before the jury to decide whether Rogers gave a signal to move the cars, without the requirement of whether the engineer believed or was justified in believing it to be such a signal. Several instructions were given at appellant's request which submitted to them the direct question of whether Rogers "gave the engineer the back-up signal," and told them that, if he did, then it was his duty to keep out of the way of the cars and that the engineer was not required to give him warning signals in making the back-up movement. This assignment is overruled.

■ Appellant further assigns error in giving plaintiff's Instruction No. 2, authorizing a verdict on the charge of negligence that the engineer knew that Rogers was walking on the track ahead of the movement in a position of danger and was oblivious thereto and caused the cars to move at such an excessive rate of speed that they overtook and injured him. The part of the instruction of which defendant complains is as follows:

"The court instructs the jury that if you find and believe from the evidence that the plaintiff was walking northwardly upon the ties of the house track mentioned in the evidence and that there was an embankment on the west side of said track and in such close

proximity thereto that it was necessary for the plaintiff to walk upon the ties of said house track, and that plaintiff was thereby in a position of danger of being struck by said cars if they were moved northwardly at said time, and *was oblivious to his said danger*, if any; and, if you further find and believe from the evidence that *the engineer* of defendant's locomotive moving said cars *knew* that plaintiff was walking northwardly on the ties of said track and in a position of danger of being struck by the cars, and *that plaintiff was oblivious to his said danger*, if any," etc.

Appellant's objection is that there was no evidence whatever that the engineer knew that plaintiff was oblivious to his danger. This requires a statement of further testimony which tended to show that there was a drainage ditch west of the house track; that dirt had been taken from this ditch and placed between it and the house track, forming an embankment; that the edge of this embankment came closer and closer to the end of the ties of the house track as it came north toward the loading platform; and that it finally sloped directly up from the ends of the ties. Rogers said that he walked between the ties and the embankment when he first left the switch stand but as he proceeded northward he was forced to walk on the ties because there was fresh dirt on top of the embankment. According to his evidence he was, for some distance before reaching the derail, walking on the end of the ties where he would be struck by the overhang of the box car if it overtook him. Appellant's evidence was that there was no fresh dirt on the embankment but that it was covered with grass and weeds which had been cut short; that the embankment was solid enough to walk on; that Rogers did walk on top of the embankment until he was almost overtaken by the cars; and that he then suddenly turned to the east and stepped directly in front of the moving cars. However, all the evidence is that the engineer said he was watching him all the time and appellant's other witnesses also saw Rogers all the time he was walking northward. All of them said that at all times he had his back to the approaching cars. The disputed matter is whether he was walking on the ends of the ties or on top of the embankment. If the jury believed Rogers' testimony, they could reasonably believe from it that he was walking in a position of danger; that he was oblivious thereto because he had his back to the approaching cars, as well as because he neither knew they were approaching nor expected them to do so, since his claim was that he did not give a back-up signal and was going to a position where he could properly spot the box car before he would give it; and that the engineer watched him as he walked north and must have known of his peril and his obliviousness thereto if he was walking where he said he was. This assignment of error is overruled.

Appellant's final assignment of error is the admission in evidence of two pictures taken of the tracks at Bethel Springs two years after Rogers was injured. The objection made at the trial was that the conditions were not the same as at the time of his injury. According to Rogers' testimony the only difference was that the pictures showed the bank covered with weeds whereas at the time of the injury it was covered with loose dirt. Appellant introduced two pictures which show the same tracks and other physical features, although taken at different distances than the others. Appellant is not in a position to object on the ground stated because its testimony was that the embankment was covered with grass and weeds at the time of the injury, for sometime prior thereto, and at all times since. Appellant's brief states that the picture exaggerates the height of the bank and its proximity to the track because of the height of the weeds at the time the picture was taken. No such objection was made at the trial. This assignment is also overruled.

The judgment is affirmed. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.